PENZIEN v. DIELECTRIC PRODUCTS
ENGINEERING COMPANY, INC.

LABOR RELATIONS—COLLECTIVE BARGAINING AGREEMENT—SEVERANCE
PAY.
    Class action by former employees for severance pay *held*, properly dismissed, where collective bargaining agreement upon which the claim was based failed to bind defendant to pay severance allowance as it contained none of the material terms essential to a contractually binding undertaking in such respect.

Appeal from Macomb; Miller (Allan C.), J., presiding. Submitted October 7, 1964. (Calendar No. 13, Docket No. 50,534.) Decided January 5, 1965. Certiorari denied by the Supreme Court of the United States on October 11, 1965.

Complaint in assumpsit by Wilbur Penzien and others, in behalf of a class similarly situated, against Dielectric Products Engineering Company, Inc., a Michigan corporation, for severance pay upon termination of operations. Directed verdict and judgment for defendant. Plaintiffs appeal. Affirmed.

*Livingston, Gregory, Van Lopik & Cranefield* (*Winston L. Livingston* and *Nancy Jean Van Lopik*, of counsel), and *Starkey & Gentz* (*William A. Gentz*, of counsel), for plaintiffs.

*Dykema, Wheat, Spencer, Goodnow & Trigg* (*James D. Tracy* and *Paul H. Townsend, Jr.*, of

REFERENCES FOR POINTS IN HEADNOTE
31 Am Jur, Labor § 106.
Construction and effect of severance or dismissal pay provisions of employment contract or collective labor agreement. 40 ALR2d 1044.

counsel), and *Johnston & Wendt* (*Ivan A. Johnston*, of counsel), for defendant.

ADAMS, J.   Plaintiffs sued for severance pay claimed by them as third-party beneficiaries of a collective bargaining agreement, basing their claim on this contract language:

"Termination of Operations
"110.   It is hereby agreed that in the event the company takes any steps to close down operations in the Mount Clemens area plant or plants, this matter including the question of severance pay, shall become subject to negotiation upon 24 hours notice by either party.   It is further understood and agreed that paragraph 103 shall not apply in the event of failure to reach agreement in such negotiations."

Paragraph 103 reads:

"The union agrees not to call any strikes, stoppages or slowdowns during the terms of this agreement unless and until the grievance and arbitration procedures as provided for herein have been exhausted, or if the employer refuses to abide by a decision of an arbitrator."

Paragraph 110 was inserted in the bargaining agreement on September 29, 1952, because of fears of the employees that the company might close down its Mount Clemens plant.   The company had located a plant in another State.   Two members of the union negotiating committee inspected the new factory and were disturbed over the size of the facilities. On their return to Michigan, negotiations took place which led to paragraph 110.   It was continued in subsequent agreements.

In the summer of 1961, the union again suspected appellee might be planning to move.   On August 25, 1961, the union requested that negotiations be held on the question of severance pay.   The request was

denied, as was a similar request dated October 4, 1961. By letter dated October 17, 1961, the union, referring to paragraph 110, informed the appellee of its intention to arbitrate the question of severance pay. Arbitration never took place because "the parties couldn't get together on arbitration so the period then went until the time there was hardly anyone left in the plant and there was no one to arbitrate the matter."

In November, 1961, a notice from the appellee directed to its employees was posted. It stated that operations were being shut down as of the latter part of the month to take inventories and that normal production would be resumed on January 4, 1962. There followed a number of meetings between the company and the union. At a meeting on the 8th of December, it became obvious to the union that Dielectric was closing down. In the latter part of December, appellee notified the union it was closing its Mount Clemens plant. Meetings were continued, but there was never any offer by the company to pay severance benefits.

At the close of plaintiffs' proofs, defendant's motion for a directed verdict on the ground that the plaintiffs had failed to prove a cause of action was granted.

Is the agreement so clear and unambiguous there is no need to resort to other evidence to determine its meaning? *Dunham* v. *W. Steele Packing & Provision Co.*, 100 Mich 75; *Gardner* v. *City National Bank & Trust Co.*, 267 Mich 270; *Paul* v. *University Motor Sales Co.*, 283 Mich 587. The key words in Paragraph 110 are: "question," "negotiation," "failure" and "agreement." Standard definitions of these words are as follows:

*Question:* "A subject or aspect that is in dispute, open for discussion, or to be inquired into:   *   *   *

a subject or point of debate."—Webster's Third New International Dictionary (1964), p 1863. "A subject or point of investigation, examination or debate; theme of inquiry; problem; matter to be inquired into; as a delicate or doubtful question."—Black's Law Dictionary (4th ed, 1951), p 1412.

*Negotiation:* "The action or process of negotiating." *Negotiate:* "To communicate or confer with another so as to arrive at the settlement of some matter; meet with another so as to arrive through discussion at some kind of agreement or compromise about something."—Webster's Third New International Dictionary (1964), p 1514. *Negotiation:* "The deliberation, discussion, or conference upon the terms of a proposed agreement; the act of settling or arranging the terms and conditions of a bargain, sale, or other business transaction."—Black's Law Dictionary (4th ed, 1951), p 1188.

*Failure:* "Omission of performance of an action or task; *esp:* neglect of an assigned, expected, or appropriate action; * * * want of success; lack of satisfactory performance."—Webster's Third New International Dictionary (1964), p 815. "Abandonment or defeat. * * * Deficiency, want or lack; ineffectualness; inefficiency as measured by some legal standard; an unsuccessful attempt."—Black's Law Dictionary (4th ed, 1951), p 711.

*Agreement:* "The act of agreeing or coming to a mutual arrangement * * * oneness of opinion * * * harmonious understanding * * * an arrangement * * * as to a course of action."—Webster's Third New International Dictionary (1964), p 43. "A coming or knitting together of minds; a coming together in opinion or determination; the coming together in accord of two minds on a given proposition; in law a concord of understanding and intention between two or more parties with respect to the effect upon their relative rights and duties, of certain past or future facts or perform-

ances; the consent of two or more persons concurring respecting the transmission of some property, right, or benefits, with the view of contracting an obligation, a mutual obligation."—Black's Law Dictionary (4th ed, 1951), p 89.

The plain language of the contract provides for dealing with a "question" that is to be subject to "negotiation" if the company takes steps to close. If the negotiations do not succeed ("failure") and no "agreement" is reached, then the union may have recourse to its remedies of strikes, stoppages, or slowdowns which are otherwise barred under paragraph 103 of the contract. But, it is contended, parol evidence as to collective bargaining negotiations is admissible to explain the terms of the executed collective bargaining agreement because the substantive Federal law controls as to admissibility.

The Federal law relating to the inclusion of parol evidence of negotiations leading to a collective bargaining agreement is far from settled. Cases such as *Pacific Telephone & Telegraph Company* v. *Communications Workers of America* (D Ore, 1961), 199 F Supp 689, 692, say that, as to the history of the negotiations, the evidence "cannot be used to change, vary or contradict the terms of the written instrument and all prior and contemporaneous agreements were merged therein and cannot be shown by parol evidence." To the same effect see *National Labor Relations Board* v. *Gulf Atlantic Warehouse Co.* (CCA 5, 1961), 291 F2d 475, 477:

"We think that ordinarily the language of the contract as finally agreed upon must be construed by the courts in accordance with ordinary rules of construction without reference to the give and take of the bargaining sessions which produced the final terminology. Otherwise we would abandon completely the parol evidence rule when dealing with this type of contract."

This holding on the parol evidence rule as it relates to a labor contract was criticized in *National Labor Relations Board* v. *Perkins Machine Company* (CCA 1, 1964), 326 F2d 488:

"We could not agree with the seeming suggestion in that opinion that the parol evidence rule required the waiver to be contained within the four corners of the written agreement."

Other Federal cases state:

"Bargaining agreements, to be binding upon company and employees, should expressly define their respective obligations as well as the limits on or extent of the employee's rights." *Nichols* v. *National Tube Co.* (ND Ohio, 1954), 122 F Supp 726, 732.

"If the contract in question were ambiguous or 'doubtful,' extrinsic evidence, particularly evidence which would indicate the contemporaneous understanding of the parties, would be admissible as an aid in construction of the disputed terms." *Lewis* v. *Hixson* (WD Ark, 1959), 174 F Supp 241, 248.

"The law is clear that where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation. (Citing cases.) *United Electrical, Radio & Machine Workers* v. *General Electric Company* (SD NY, 1962), 208 F Supp 870, 872.

The trend of the Federal decisions is away from a rigid adherence to the parol evidence rule. *Independent Soap Workers* v. *Procter & Gamble Manufacturing Company* (CCA 9, 1963), 314 F2d 38, cites the rule that words in a collective bargaining agreement are to be interpreted in the background and light of bargaining history. To the same effect, see *Pacific Northwest Bell Telephone Company* v. *Communications Workers of America* (CCA 9, 1962), 310 F2d 244; *Local Union No. 787, International Union*

*of Electrical, Radio & Machine Workers, AFL–CIO,*
v. *Collins Radio Company* (CCA 5, 1963), 317 F2d
214; *Independent Petroleum Workers* v. *American
Oil Company* (CCA 7, 1963), 324 F2d 903. A state-
ment by Mr. Justice Brennan in his concurring
opinion in *United Steelworkers of America* v.
*American Manufacturing Co.* (1960), 363 US 564,
570 (80 S Ct 1343, 1363, 1364, 4 L ed 2d 1403, 1432),
is indicative of that trend:

> "Words in a collective bargaining agreement,
> rightly viewed by the Court to be the charter instru-
> ment of a system of industrial self-government,
> * * * are to be understood only by *reference to
> the background* which gave rise to their inclusion.
> * * * Guidance is given by identifying the various
> considerations which a court should take into ac-
> count when construing a particular clause—*consider-
> ations of the milieu in which the clause is negoti-
> ated."* (Emphasis supplied.)

Reading the above cases together, it would appear
that the rule is correctly stated in appellants' brief
as follows:

> "Parol evidence as to bargaining history may be
> used to explain or to add to the terms of collective
> bargaining agreements, but not to contradict such
> agreement."

The parol evidence which appellants sought to in-
troduce consisted of statements made during the
course of negotiations. It was received by the court
in the absence of the jury. The testimony most
favorable to the appellants was given by Wilbur
Penzien, Marvin Duckert, and James Kandt, mem-
bers of the negotiating committee.

*Wilbur Penzien*—"They [the company] would be
willing to pay severance pay if and when they shut
the plant down. * * * He [Dabney, vice-presi-
dent] stated that if the company were to set an

amount at that time they would have to set up a
fund to contribute towards it and it would take
funds away from them that they could use to expand
facilities. * * * And along with that he stated
that they would put this clause [Paragraph 110]
into the contract and if the union did not get what
they wanted through negotiations they could strike
the plant and they wouldn't be able, the company
wouldn't be able to take any of the facilities, the
machinery or anything out of there and he also cited
that the union would perhaps use the same tactics
they used in March and April of 1952 when we had
a strike for 5 weeks over a wage increase.

"He said at that time that, 'If you fellows don't
get what you want,' he said, 'you can go to work
and throw a ring around this plant with your
pickets.' * * *

"Joseph Bauman who was personnel director at
the time also stated that if the union didn't get what
they wanted they would perhaps buy up all the
carpet tacks in Mount Clemens and distribute them
along the driveway so that no trucks or anything
could get out of there."

*Marvin Duckert*—"It was then stated that you
have this right—we will pay. * * * They men-
tioned in the event we are not willing to or if we do
shut it down and we don't reach an agreement upon
the amount, you could tie us up in the same way,
we wouldn't be able to move anything out of the
shop because the other union would not allow picket
lines."

*James Kandt*—"Dabney was called into the meet-
ing and he said, 'I don't know what you fellows have
got to worry about.' He said, 'You could always
throw a picket line around the place like you did
when we had our strike for five weeks. But one of
the things the company objects to is to the setting
money into severance, as it might hurt our credit
rating. It is a big thing to the company and it
might hurt our credit rating,' and things like that.

He said, 'I wish you fellows would hold off. It will be paid when it comes to the point.' Like I said before, he said it wouldn't be satisfactory, that 'You could draw a picket line out there and settle on that basis.' That was the crux of it."

The evidence serves to explain the terms of the contract and does not, taken in context, contradict it. It would have been a proper consideration for the jury.

The trial judge, in directing a verdict, considered all of the evidence. The exclusion of the parol evidence from the jury would not be prejudicial error if he was correct in entering verdict for the defendant. *Larkin* v. *Mitchell & Rowland Lumber Co.,* 42 Mich 296. A new trial will not be granted unless the error committed was prejudicial. *Britten* v. *Updyke,* 357 Mich 466. To what extent are appellants' contentions reinforced by the parol evidence? The testimony most favorable to appellants, together with other testimony by the same witnesses, if construed with the plain language of paragraph 110, in the minds of reasonable men can lead to only one conclusion—the question of severance pay was never finalized. *Garbacz* v. *Grand Trunk W. R. Co.,* 323 Mich 7; *United States Fire Insurance Company* v. *Grand Trunk W. R. Co.,* 344 Mich 270.

Since there was no agreement for severance pay, the problem of determining the amount, in the absence of an express agreement as to amount, need not be considered. Likewise, it is not necessary to consider whether the grievance procedure contained in the contract was available to plaintiffs or, if it was available, whether their failure to exhaust it would have been a bar to this action.

The trial court is affirmed. Costs to appellee.

DETHMERS and KELLY, JJ., concurred with ADAMS, J.

SOURIS, J. (*concurring*). I concur in affirmance, but solely on the ground that paragraph 110 of the collective bargaining agreement fails to bind defendant to pay severance allowances. It contains none of the material terms essential to a contractually binding undertaking. *Hansen* v. *Catsman,* 371 Mich 79, and *Professional Facilities Corp.* v. *Marks,* 373 Mich 673.

KAVANAGH, C. J., and BLACK, SMITH, and O'HARA, JJ., concurred with SOURIS, J.