**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0893n.06
Filed: December 14, 2006

**06-1215**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

GEORGE M. REARDON,            )
                             )
    Plaintiff-Appellant,      )
                             )
v.                           )    ON APPEAL FROM THE UNITED
                             )    STATES DISTRICT COURT FOR THE
KELLY SERVICES, INC.,         )    EASTERN DISTRICT OF MICHIGAN
                             )
    Defendant-Appellee.       )
                             )
                             )
                             )
                             )

Before:  DAUGHTREY and COLE, Circuit Judges, and RESTANI,* Judge.

**RESTANI, Judge.**  At issue in this dispute is the interpretation of a severance provision in an employment contract between Plaintiff-Appellant George M. Reardon ("Reardon") and Defendant-Appellee Kelly Services, Inc. ("Kelly").  From 1998 until 2004, Reardon was employed as Senior Vice President and General Counsel for Kelly, an employment services firm.  Following his termination, Reardon asserts that the plain language of his employment contract entitles him to a severance payment in excess of 2.1

---

*The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

million dollars. Kelly argues that the contract's language does not entitle Reardon to any severance payment.

Judge Tarnow of the U.S. District Court for the Eastern District of Michigan granted summary judgment in favor of Kelly, and Reardon appeals. We find that the language of the contract, when interpreted as a whole, unambiguously shows that Reardon was not entitled to a severance payment following his termination in 2004.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 18, 1998, Kelly gave Reardon a written offer for the position of Senior Vice President and General Counsel. The offer included $180,000 in salary, a bonus of $63,000 in short-term incentive pay ("STIP"), and stock options. On March 20, 1998, Reardon submitted a counteroffer which requested $210,000 in salary, an agreement from Kelly to pay the remaining rent on his office lease in Houston, and an eighteen-month continuation of salary and insurance benefits in the event of his involuntary termination. In a written reply on March 24, 1998, Kelly offered Reardon $190,000 in salary and agreed to pay the remaining rent on his office lease until a sub-lessee was found. Kelly refused Reardon's request for an 18-month severance package, but suggested the following provision:

> If you voluntarily terminate your employment for any reason within a year of your starting date, the restricted share and stock option awards and the office lease reimbursement will be canceled. If your termination by the Company is other than for cause, i.e. violation of policy or misconduct

> reflecting adversely on the company, you will be paid a separation allowance representing the difference between your first year's compensation of $256,000 ($190,000 plus $66,500 guaranteed STIP payment) and the compensation payments you will have already received.

J.A. at 128.[1]  Reardon signed and accepted the revised offer on March 24, 1998.

Reardon's employment with Kelly lasted approximately six years, until he was terminated without cause on June 9, 2004, due to corporate restructuring.  Upon his termination, Kelly offered Reardon a severance package that included nine months' pay, outplacement services, and continued health-insurance coverage in exchange for a release of claims and a non-competition agreement.  After some negotiations, Reardon refused Kelly's severance offer, leading to the present dispute over the interpretation of the severance provision in Reardon's employment contract.

On March 31, 2005, Reardon filed a complaint in the Eastern District of Michigan, invoking diversity jurisdiction.  On June 7, 2005, Reardon moved for summary judgment, arguing that he was entitled to receive a separation allowance under the unambiguous language of the employment agreement.  Reardon argued that the contested language of the contract consisted of two sentences describing separate and distinct obligations:  the first, which addressed Reardon's voluntary departure (the "first sentence"), and the second, which addressed involuntary termination (the "second sentence").  He maintained that the

---

[1]It should be noted that $190,000 plus $66,500 equals $256,500, not $256,000. The parties have accepted the $256,000 figure for the purposes of this appeal.

plain language of the second sentence entitled him to a severance payment plan that decreased as he approached the end of his first year of employment but increased as his employment continued beyond that date.[2] Based on this interpretation, Reardon asserted that he was owed his entire compensation during his approximately six years of employment with Kelly, minus $256,000, a total of $2,168,747.63.

Kelly responded and filed a cross-motion for summary judgment on July 8, 2005. Kelly also contended that the provision was unambiguous, arguing that Reardon improperly read each sentence of the provision in isolation. Kelly asserted that it was clear that the one-year limitation stated in the first sentence of the provision applied in the next sentence expressly addressing severance. Under this interpretation, Reardon would be entitled to a separation allowance only during the first year of his employment.

Following oral argument, the district court found that "[a]lthough the provision at issue here is susceptible to two literal meanings, Defendant's interpretation is reasonable while Plaintiff's is clever but unreasonable." Reardon v. Kelly Servs., Inc., No. 05-71272, slip op. at 7 (E.D. Mich. Dec. 22, 2005). The court interpreted the two sentences at issue to be one harmonious provision, unified by subject matter, i.e., Reardon's leaving the

---

[2]The parties do not dispute that, if Reardon had departed involuntarily and not for cause in the first year of employment, his severance would have been calculated by subtracting the total amount he had earned up to his date of termination from his first-year compensation of $256,000. The payment would continue to decrease until reaching zero at his first-year anniversary. Reardon maintains that after one year, as his total compensation began to exceed $256,000, his severance pay would begin to rise with every paycheck.

company during his first year of employment.  Id. at 8.  The court thus concluded that the provision's contiguous and unified subject matter could only be interpreted to mean that the temporal limitation in the first sentence also applied to the second sentence.  Id. Consequently, the district court denied Reardon's motion for summary judgment and granted Kelly's cross-motion for summary judgment.  Id.

## DISCUSSION

### A.  Jurisdiction and Standard of Review

The district court had jurisdiction pursuant to 28 U.S.C. § 1332 (2000).  Reardon is a resident of Melville, New York, and Kelly is based in Troy, Michigan.  We have jurisdiction to review a final order of a district court granting summary judgment under 28 U.S.C. § 1291.  We review a district court's decision to grant summary judgment de novo, applying the same standard as the district court.  Alkire v. Irving, 330 F.3d 802, 809 (6th Cir. 2003). When parties file cross-motions for summary judgment, the court draws all inferences, in turn, for the non-moving party to determine whether there are genuine issues of material fact to be tried.  See B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001).  In a contractual dispute, summary judgment is permissible when the language of the contract is unambiguous, or, if the language is ambiguous, where extrinsic evidence leaves no genuine issue of material fact and permits interpretation of the agreement as a matter of law.  See UAW Local 540 v. BVR Liquidating, Inc., 190 F.3d 768, 772 (6th Cir. 1999).

**B. The Contract Unambiguously Supports Kelly's Interpretation**

Under Michigan law,[3] the purpose of contract interpretation is "'to ascertain the intention of the parties.'" City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool, 702 N.W.2d 106, 113 (Mich. 2005) (quoting McIntosh v. Groomes, 198 N.W. 954, 955 (Mich. 1924)). Whenever possible, the parties' intent is to be discerned from "the language in the contract, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument." Wilkie v. Auto-Owners Ins. Co., 664 N.W.2d 776, 780 (Mich. 2003). "[I]f the language of a written contract is subject to two or more reasonable interpretations or is inconsistent on its face, the contract is ambiguous, and a factual development is necessary to determine the intent of the parties." Petovello v. Murray, 362 N.W.2d 857, 858 (Mich. Ct. App. 1984).[4] Nevertheless, "'if a contract, however inartfully worded or

---

[3]The district court assumed, and no party has contested, that Michigan law governs the interpretation of Reardon's employment contract.

[4]Contrary to Reardon's claims, Rory v. Continental Insurance Co., 703 N.W.2d 23 (Mich. 2005), does not prevent us from inquiring into whether a proposed interpretation is a "reasonable" reading of the contract. In Rory, the Michigan Supreme Court rejected a reasonableness test for a contractually shortened period of time in which to bring suit under an insurance policy. Id. at 30–31. Certain lower courts had found that such a provision could be enforced only if it was "reasonable" under a three-part test. Id. at 30. The Michigan Supreme Court found that "[a] fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be enforced as written," and that the reasonableness evaluation allowed judges to "rewrite the contract . . . contrary to the bedrock principle of American contract law that parties are free to contract as they see fit." Id. at 30–31 (emphasis omitted). Rory involved no dispute as to the meaning of the contractual provision in question. Rory's discussion of "reasonableness" was directed exclusively towards judicial consideration of the reasonableness of the

clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear.'" City of Grosse Pointe, 702 N.W.2d at 114 n.8 (quoting Raska v. Farm Bureau Mut. Ins. Co. of Mich., 314 N.W.2d 440, 441 (Mich. 1982)).

Numerous Michigan courts have held that contracts must be read as a whole. A court must consider the entirety of the contractual text whenever construing any portion of a contract. Wilkie, 664 N.W.2d at 781 n.11 ("We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase.") (citing Singer v. Goff, 54 N.W.2d 290, 292 (Mich. 1952)); Allstate Ins. Co. v. Tomaszewski, 447 N.W.2d 849, 850 (Mich. Ct. App. 1989) ("[T]he contract must be read and interpreted as a whole."). An interpretation derived from a reading of the contract as a whole is preferred to an interpretation taken from a reading of a single provision in isolation. See Turner v. Bituminous Cas. Co., 244 N.W.2d 873, 896 (Mich. 1976) ("[T]he literal sense of certain words should not interfere with interpretation of the contract as a whole."); Staebler-Kempf Oil Co. v. Mac's Auto Mart, Inc., 45 N.W.2d 316, 318 (Mich. 1951) ("The meaning of any particular part of an instrument can only be found by an examination of the whole."); see also 5A Stephen Lease, Mich. Civ. Jur. Contracts § 150 (2002) ("[I]n construing the contract as a whole, the court takes into consideration, reconciles, and gives meaning to all of its parts or clauses

---

enforcement of an unambiguous contractual provision, not the court's responsibility to consider the reasonableness of a proposed interpretation of a contract's terms. A court may consider whether a proposed reading of a contract's language is a reasonable interpretation of the text. Once the meaning of a contractual provision is discerned, however, the court is generally forbidden from considering whether the results of contract enforcement would be "reasonable."

as far as possible, including recitals as well as operative clauses.  When considered in this manner, language that has a distinct meaning standing alone may, in the connection used, become doubtful, or its meaning modified by other parts of the instrument . . . .") (footnotes omitted).

Reading the employment contract as a whole, it is clear that the meaning of the second sentence of the provision in question is informed by the terms of the first sentence. It is therefore unambiguous that the entire provision applies only to the first year of Reardon's employment.

The word choice and syntax of the agreement indicate that the two sentences of the provision were intended to be read together.  The fact that the language in question forms one separate and distinct paragraph, while not dispositive, is significant.  The placement of terms implies a relationship between provisions.  See Stark v. Budwarker, Inc., 181 N.W.2d 298, 301 n.4 (Mich. Ct. App. 1970) ("'Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph.'") (quoting Restatement (Second) of Contracts § 228(2) cmt. d (Tentative Draft No. 5, 1970)).[5]  The existence of a relationship between the two sentences at issue is confirmed by the use of the phrase "your termination" in the second sentence.  That phrase indicates that the events described in the second sentence are an alternative to the events described in the first sentence regarding the first year of

---

[5]This sentence from the draft restatement is now found at Restatement (Second) of Contracts § 202 cmt. d (1981).

Reardon's employment. The use of this language, which would be awkward standing alone, highlights the reciprocal responsibilities each party would bear should one party unilaterally terminate the employment agreement in that year.

The relationship suggested by the structure of the provision is further supported by the common subject matter and function of the two sentences. The first sentence protected Kelly in the event that Reardon suddenly terminated his employment by allowing Kelly to cancel Reardon's stock options and lease payments. Similarly, the second sentence allowed Reardon to rely on Kelly's offer of employment, guaranteeing that he would receive his entire first year's salary regardless of whether Kelly kept him or not. After the first year, however, Kelly would not be protected from possible losses resulting from Reardon's departure. If Reardon quit after one year, Kelly would still be obligated to pay Reardon's remaining lease payments for the next three years, and could not cancel Reardon's stock options. The reciprocal nature of these obligations implies that Reardon would not be protected from involuntary termination following his first year.

Reardon's proposed interpretation suggests an entirely different and incongruous benefit. Reardon's contention is that, in addition to the arrangement that is undeniably present in the provision, the parties also clearly intended to bestow an additional benefit on Reardon without any similar benefit for Kelly. That benefit could grow to a substantial size – as the district court noted – potentially equal to nineteen years' salary or more. If the parties had intended to create an additional retirement benefit for Reardon, they would have adopted it explicitly, rather than implying it in a provision that conveys a separate and

limited short-term protection. Cf. Vansen v. City of Pontiac, No. 218520, 2001 WL 879021 at *2 (Mich. Ct. App. Aug. 3, 2001) (not precedential) (finding an interpretation of a provision in a collective bargaining contract that would prevent any termination of employment for cause would be "an extraordinary provision that would have merited an explicit mention" in the contract).

Reardon contends that, because it is possible to read the alternative obligations in the provision separately, the two sentences must not be read in conjunction to imply that the one-year limitation applies to the entire provision. Reardon cites numerous cases where Michigan courts have ostensibly refused to find a limitation expressed in one provision to be implied in another provision. For example, Reardon notes that in Barner v. City of Lansing, 183 N.W.2d 877 (Mich. Ct. App. 1970), the court refused to read together two separate provisions dealing with additional pay under an "Overtime" clause of an employment contract.[6] The first clause, entitled "[t]ime and one-half," applied to time

---

[6]The clause stated:

Section 9. Overtime

A. General Provisions
Time and one-half. Time worked in excess of eight (8) hours per day or forty (40) hours per week, or on a holiday recognized in this Agreement (in addition to holiday pay therefor), shall be compensated for at the rate of one and one-half times the employee's regular hourly rate of pay, exclusive of shift or premium pay.

Double-Time. Double-time will be paid for all hours worked on Sunday.

Barner, 183 N.W.2d at 877–78.

worked over eight hours in one day, or forty in one week, and to all hours on holidays. Id. at 877–78. The second clause, entitled "[d]ouble-[t]ime," stated that "[d]ouble-time will be paid for all hours worked on Sunday." Id. at 878. Employees sued, claiming that they were entitled to double pay for all hours worked on Sunday, not just overtime hours. Id. at 877–78. The court agreed, finding that the hourly limitations found in the first clause did not limit the provisions of the second clause. Id. In Barner, however, the hourly requirement for overtime was clearly limited even in the first clause because time-and-one-half was paid for all hours worked on holidays. The double-pay provision could be likened to the policy providing extra pay for specific days. In this case, there is no exception specified as to the one-year limitation.

Reardon also cites to Fox v. Detroit Trust Co., 281 N.W. 399 (Mich. 1938), but that case does not require a contrary outcome. At dispute in Fox was a contractual provision which assigned the contractual rights to rent from a certain apartment building "so long as the bonds and mortgage aforesaid are in default and said Charles H. Stevenson shall continue to manage and conduct the said . . . [a]partments and operate the same." Id. at 401. The plaintiff claimed that this provision created two conditions to payment of rent under the assignment – that the mortgage be in default, and that Mr. Stevenson remain the manager. Id. The court refused to accept this interpretation, finding that the unambiguous language of the contract imposed only one condition on assignment – default on the mortgage. Id. The court noted that the parties' failure to add "so long as" before "said Charles H. Stevenson" in the above sentence, when that "would have obviously clarified

the meaning," was "some indication that management by Stevenson was not considered by the parties as a condition." Id.

The court's opinion in Fox did not rest entirely on a refusal to "import" the term "so long as" from the first part of the sentence to the last part, or on a categorical refusal to imply conditions in one part of a contractual provision to a related contractual provision. Instead, the court noted that a contract "must be read as a whole and together with the remaining provisions of the assignment, and not by disassociating one part thereof from the remainder." Id. The court also found that "[t]he surrounding circumstances . . . may properly be considered" in determining the parties' intent. Id. Reading the contract as a whole, in light of the circumstances when the contract was made, the court found that it would be "unreasonable to suppose that the parties intended to enter into an agreement that could be terminated by Stevenson immediately after the execution thereof by merely declining to act as manager." Id. The court even inserted punctuation into the provision to make it more clear, finding that the meaning of the sentence could be "illustrated by reading the sentence as though a semicolon or comma were inserted after the word 'default.'" Id.

Thus, Fox does not stand for the proposition that Michigan courts will not allow the meaning of a discrete provision of a contract to be influenced by the language of the contract as a whole. Indeed, the Fox court considered the underlying purpose of the contract and even implied a change in punctuation in arriving at its conclusion that the plaintiff's interpretation of the contract was unreasonable.

Likewise, in this case, the purpose and phrasing of the entire contract informs our conclusion that the paragraph at issue should be read as a whole. We therefore conclude that the disputed provision is unambiguous, and applies only to the first year of Reardon's employment with Kelly.

## C. Extrinsic Evidence Confirms that Kelly's Interpretation is Correct

Even if we were to assume that the contract is susceptible to more than one interpretation, undisputed extrinsic evidence would lead us to the conclusion that Kelly's interpretation reflects the parties' intent. In Michigan, when a contract is subject to more than one reasonable interpretation, the court may admit extrinsic evidence of the parties' intentions. Klapp v. United Ins. Group Agency, Inc., 663 N.W.2d 447, 454 (Mich. 2003). The task of contract interpretation then becomes a question of fact. Id. To resolve an ambiguity, "'the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning.'" Id. at 454 (quoting 11 S. Williston, Law of Contracts § 30:7 (4th ed. 1999)). Extrinsic evidence includes "'the parties' conduct, the statements of its representatives, and past practice.'" Id. (quoting Penzien v. Dielectric Prods. Eng'g Co., 132 N.W.2d 130, 132 (1965)).

The undisputed evidence of the history of negotiations between Reardon and Kelly provides a clear indication of the parties' intent in this case, based on the series of offers and counteroffers that eventually culminated a middle-ground position acceptable to both

parties. Kelly sent an initial offer of employment to Reardon, proposing a salary of $180,000 per year, plus STIP, but did not mention a severance payment or lease reimbursement. Reardon counter-offered, seeking $210,000 in salary, plus STIP, and a severance package of eighteen months' salary following any involuntary termination. Kelly responded with another counteroffer, increasing Reardon's base salary to $190,000 but refusing to provide eighteen months' severance pay. Instead, Kelly offered the provision at issue as a compromise position.

The fact that the two sentences at issue were never treated separately, but were inserted together in response to the same request, confirms what is apparent from their phrasing and structure – that the two sentences concern the same subject matter, and that the meaning of one should inform the other. The negotiation history also makes clear that the purpose of the severance package was, as Reardon wrote to Kelly, "to deal with the potential risk of immediate financial crisis through loss of position." J.A. at 152 (Letter from George M. Reardon to Terence E. Adderley (Mar. 20, 1998)). A guarantee that Reardon would receive his first year's salary of $256,000 is consistent with the purpose of the severance provision, which was to protect Reardon in the event that he lost his job and needed to seek other employment. Reardon's interpretation, however, does not fit this purpose. As Reardon neared retirement, when he would no longer need to seek new employment to avoid an "immediate financial crisis," he would become entitled to far larger severance payments. Such a benefit is not only inconsistent with the reciprocal phrasing

of the two sentences, but also with Reardon's stated purpose in seeking a short-term severance agreement.

Finally, the negotiation history indicates that Kelly intended the provision as a whole to be more favorable to itself than Reardon's proposal for an eighteen-month severance package. Reardon argues that his interpretation of the second sentence would be less valuable to him than his proposed eighteen-month severance package because the severance benefit provided in the final contract would not have protected him in the event of involuntary dismissal for cause. Reardon also argues that his proposed interpretation of the provision would have provided him with less compensation for the first two-and-a-half years of employment, the time in which he claims he was most likely to be terminated without cause. From Kelly's perspective, however, a perpetually-increasing severance package would be less favorable than an eighteen-month severance package. Such a payment would, over time, represent a far larger financial burden for Kelly than a fixed payment of eighteen months' salary. Such an increasing benefit would gradually expose Kelly to greater and greater liability in its treatment of Reardon, effectively denying the company the ability to dismiss Reardon without cause. A perpetually increasing severance package would not have been a compromise, but an additional expense that would have exposed Kelly to greater risk than the severance package Reardon himself requested.

## CONCLUSION

The disputed contractual provision is unambiguous, and Reardon cannot claim that he was entitled to any severance payments following his first year of employment with Kelly. Accordingly, we AFFIRM the district court's grant of summary judgment.