NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0198n.06

Case No. 13-2187

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Mar 11, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN MORETTI and LAURA MORETTI, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| BANK OF NEW YORK MELLON, FKA | ) | THE WESTERN DISTRICT OF |
| BANK OF NEW YORK, AS TRUSTEE FOR | ) | MICHIGAN |
| THE BENEFIT OF | ) | |
| CERTIFICATEHOLDERS CWMBS, INC. | ) | |
| CHL MORTGAGE PASS THROUGH | ) | |
| TRUST SERIES 2005-2, MORTGAGE PASS | ) | |
| THROUGH CERTIFICATES, 2005-2; BANK | | |
| OF AMERICA, N.A., SUCCESSOR BY | | |
| MERGER TO BAC HOME LOANS | | |
| SERVICING, L.P., | | |
| | | |
| Defendants-Appellees. | | |

**BEFORE: KEITH, COOK, and DONALD, Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge.** Plaintiffs-Appellants John and Laura Moretti appeal a district court decision dismissing their contract claims against Defendants-Appellees Bank of New York Mellon, *et al.* regarding a mortgage loan on residential property in Michigan. Plaintiffs claim that, prior to any default of their own, Defendants had repudiated the loan modification agreement between the parties by demanding more than twice the agreed-upon monthly payment. Defendants argue that they did not repudiate the contract and that Plaintiffs defaulted on their loan. After completion of discovery, an extension for further development of

the record, and two hearings on the matter, the district court granted Defendants' motion for summary judgment. For the reasons that follow, we AFFIRM.

## I. BACKGROUND

Plaintiffs-Appellants John and Laura Moretti (the "Morettis") purchased the residential property at issue in Alden, Michigan, in November 2003. On January 14, 2005, John Moretti executed an adjustable rate promissory note in favor of Countrywide Home Loans, Inc., d/b/a/ America's Wholesale Lender ("Countrywide") for $520,000.00. (R.29-2, PageID #249-52.) To secure the note, the Morettis executed a mortgage on the property in favor of Countrywide the same day. (R.29-3, PageID #254-65.) They also executed an adjustable rate rider and second home rider to supplement the mortgage with Countrywide. (R.29-4, PageID #267-75.)

The Morettis had difficulty making the mortgage payments on the property. On March 18, 2009, Countrywide and John Moretti entered into a Loan Modification Agreement, which stated in relevant part:

> 1. As of the 1st day of April, 2009, the amount payable under the Note or Security Instrument (the "Unpaid Principal Balance") is U.S. $536,186.98, consisting of the amount(s) loaned to the Borrower by the Lender which may include, but not limited to, any past due principal payments, interest, fees and/or costs capitalized to date.
> 2. The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the Lender. Interest will be charged on the Unpaid Principal Balance from the 1st day of April, 2009. The Borrower promises to make monthly payments in the amount of U.S. $1,340.47 beginning on the 1st day of May, 2009. **The monthly payment will adjust in accordance with the Note, and any other loan document that is affixed to or incorporated into the Note** and Rider and provides for, implements or relates to any change or adjustment in the monthly payment amount under the Note. If on the 1st day of February, 2035 (the "Maturity Date"), the borrower still owes amounts under the Note and Security Instrument, as amended by this Agreement, the Borrower will pay these amounts in full on the Maturity Date.

(R.29-5, PageID #277 (emphasis added).)

On April 6, 2009, Countrywide paid $29,963.76 to the county treasurer for delinquent taxes on the property. (R.64-5, PageID #1222-23.) This created an escrow deficiency of $29,963.76 on the Morettis' loan account. (R.64-5, PageID #1223.) Countrywide notified the Morettis of the payment and deficiency in a letter dated April 6, 2009. (R.64-5, PageID #1224.) The letter explained that Countrywide had paid the taxes to protect its interest in the property and that, under the terms of their mortgage, the Morettis were required to reimburse Countrywide for the amount. (R.64-5, PageID #1224; *see also* R.29-3, PageID #256 ("Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for . . . taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property[.]").) The letter also stated that Countrywide would "increase [the Morettis'] monthly mortgage payment to fund the escrow account at a level sufficient to pay [their] property taxes on the next tax due date" and that their "next monthly statement [would] reflect [their] new payment amount." (R.64-5, PageID #1224.)

The Morettis timely made the first required payment of $1,340.47 for May 2009 under the Loan Modification Agreement. (R.55-1, PageID #628, 642; R.59-2, PageID #861.) This payment was applied toward the loan. (R.55-1, PageID #628, 642.)

Countrywide then sent the Morettis a document dated May 1, 2009, that set out payment options under the modified loan: "Option 1 Amortized Payment (principal and interest) – based on your remaining term[,]" which the document indicated would be $2,487.64, due May 1, 2009, and "Option 2 15-Year Amortized Payment (principal and interest)[,]" which the document indicated would be $4,836.10, due May 1, 2009. (R.37, PageID #548.) On May 6, 2009,

Countrywide sent the Morettis a follow-up letter. (R.55-1, PageID #644-46.) The letter began with the heading, "Significant Payment Increase Alert," and continued, "[t]his is a message to alert you that based on monthly payment options you have selected and potential future interest rate changes, the monthly Minimum Payment on your mortgage will increase significantly." (R.55-1, PageID #644.) However, the bottom of the first page stated, "[p]lease note this is not a notice of payment increase, but simply a forecast of what your new payment may be in the future if your payment habits remain the same." (R.55-1, PageID #644.) The next page contained the following text and chart:

POSSIBLE PAYMENT INCREASE (FOR INFORMATIONAL PURPOSES ONLY)

| Current Principal Balance | Current Principal Balance as a Percentage of Original Loan Amount | Estimated Principal Balance at Recalculation | Current Interest Rate | Estimated Remaining Term at Recalculation | Estimated New Monthly Minimum Payment | Current Minimum Payment | Increase From Current Minimum Payment |
|---|---|---|---|---|---|---|---|
| $536,185.98 | 103.11% | 598,000.00 | 3.000% | 320 | $2,717.08 | $1,340.47 | $1,376.61 |

(R.55-1, PageID #645.) During this time, the Morettis' mortgage passed from Countrywide to BAC Home Loans Servicing LP, which then merged into Defendant Bank of America, N.A. ("BANA"). (Appellee Br. 6, n.1.)

After the Morettis' initial May 2009 payment, John Moretti states that he submitted two further payments of $1,340.47 (the June and July 2009 payments), but that neither check was cashed. (R.55-2, PageID #696-97.) BANA's records indicate that the Morettis remitted only a second payment of $1,340.47 on or about July 2, 2009, which was posted to the loan as their June 2009 payment. (R.55-1, PageID #628, 642.) Confused about the May 2009 mailings from Countrywide, John Moretti called the company to clarify. He states he was repeatedly told that someone would "look into it," but that no one ever called him back. (R.55-2, PageID #671-72; 674; 676.)

On July 2, 2009, BANA sent a letter to the Morettis stating that the loan payment for July 2009 had not been received and that the total due on the loan was $5,764.26. (R.30-1, PageID #281.) After litigation began, BANA explained that this amount included the scheduled July 2009 payment of $1,340.47, a $4,318.20 escrow payment, and a $105.59 late fee, but this itemization was not part of the July 2, 2009, letter to the Morettis. (R.30-1, PageID #281; *see also* R.73, PageID #1241-42.) John Moretti states that his calls—now to BANA instead of Countrywide—continued unreturned. (R.55-2, PageID #676 ("[T]he theme was that they would look into it and get back to me to see what ha[d] happened.").)

The Morettis submitted no further payment after July 2009. (R.55-2, PageID #694-95.) On March 31, 2010, BANA sent the Morettis a letter stating that the bank had not received the requisite past-due payments and that the property was subject to foreclosure. (R.30-2, PageID #283.) On April 5, 2010, the mortgage was assigned to Defendant Bank of New York Mellon ("BNYM"). (R.30-4, PageID #288.) John Moretti filed for Chapter 7 bankruptcy on April 21, 2010. (R.31-3, PageID #297-301.) On July 22, 2010, BNYM began foreclosure-by-advertisement proceedings on the property, (R.30-5, PageID #290), and a foreclosure sale was ultimately scheduled for January 20, 2012, (R.31-2, PageID #295). The sale has been suspended pending conclusion of the present litigation.

The Morettis filed a complaint against BANA, BNYM, and others associated with the mortgage in state court on May 6, 2011. (R.1-2, PageID #9-22.) Defendants removed the claim to federal court, (R.1-3, PageID #25-26), and the Morettis filed an amended complaint shortly thereafter on fourteen counts including breach of contract, fraud, and wrongful foreclosure, (R.16, PageID #136-55). After discovery, Defendants moved for judgment on the pleadings and for summary judgment. The district court held a hearing on August 1, 2012, and finding the

record insufficient, re-opened discovery and asked the parties to investigate further. (R.43, PageID #581; R.56, PageID #838.) After further development of the record, supplemental briefings from both sides, and a second hearing on August 8, 2013, the district court granted summary judgment to Defendants on all claims and dismissed the Morettis' case. (R.66, PageID #122; R.67, PageID #1228; R.73, PageID #1264-65.) The Morettis appeal.

## II. ANALYSIS

The Morettis argue that the district court erred in granting summary judgment because they presented a genuine issue of material fact for trial on their contract claims against Defendants.[1] We review de novo a district court's grant of summary judgment. *Vander Boegh v. Energy Solutions, Inc.*, 772 F.3d 1056, 1059 (6th Cir. 2014). "Summary judgment is properly granted when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Freeze v. City of Decherd, Tenn.*, 753 F.3d 661, 664 (6th Cir. 2014). "[F]actual allegations must be enough to raise a right to relief above the speculative level and to state a claim to relief that is plausible on its face." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555, 570 (2007)) (internal quotation marks omitted).

The Morettis raise arguments in favor of remand under multiple theories of contract law. Their first claim is that, under the principle of contra proferentem, any ambiguity in the contract drafted by Defendants—*i.e.*, the Loan Modification Agreement—must be interpreted in favor of the Morettis. *See, e.g.*, *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453-55 (Mich. 2003). Under Michigan law, they argue, "if a contract is ambiguous, as the loan modification

---

[1]On appeal, the Morettis have abandoned their claims related to the foreclosure process in light of intervening decisions issued by the Michigan Supreme Court. (Appellant Br. 1; Appellant Reply Br. 4.)

documents are in the present case, then the meaning of the contract is a question of fact and the fact finder must examine extrinsic evidence to ascertain the intents of the parties." (Appellant Br. 20.) But by their own admission, the Morettis did not find the Loan Modification Agreement ambiguous: they understood the terms of the contract, agreed to it, and began performance thereunder. (Appellant Br. 8 ("It is clear that Appellants knew the [r]amifications of the loan modification agreement and stood ready and able to make the agreed upon monthly payment of $1,340.47.").) They acknowledge this issue in part by clarifying that it is the *combination* of the contract with Defendants' subsequent communications to the Morettis that "create[d] an ambiguity that must be resolved in favor of Appellants." (Appellant Br. 18-19.) But they offer no argument or authority under which we might interpret the communications as part of the contract itself, and Michigan's application of contra proferentem requires that the language of the contract itself be ambiguous. Only with that ambiguity established does the fact finder proceed to contemplate "such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation." *Klapp*, 663 N.W.2d at 454 (quoting *Penzien v. Dielectric Prods. Eng'g Co., Inc.*, 132 N.W.2d 130, 132 (Mich. 1965)) (internal quotation marks omitted). Accordingly, the Morettis present no genuine issue of fact on this claim.

Nor do the Morettis present evidence that they are entitled to proceed to trial under the "first breach rule" in contract. It is true that, in Michigan, "one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Frost v. Wells Fargo Bank, N.A.*, 901 F. Supp. 2d 999, 1008 (W.D. Mich. 2012) (quoting *Flamm v. Scherer*, 198 N.W.2d 702, 706 (Mich. Ct. App. 1972)). It is also true that questions regarding the parties' credibility are primarily for a jury. *See, e.g., Bd. of Cnty Rd.*

*Comm'rs of Kalamazoo Cnty v. Bera*, 129 N.W.2d 427, 429 (Mich. 1964). But the Morettis do not develop this argument beyond merely quoting legal principle, and it is unclear what issue of credibility or intent they seek to have decided by a jury under this theory. To the extent the Morettis seek to argue that Defendants' communications in May and July 2009 signify a breach of the Loan Modification Agreement, the claim is too underdeveloped to create a genuine dispute for trial.

The core of the Morettis' case is their claim that Defendants' communications in May and July 2009 "unilaterally altered" the Loan Modification Agreement to demand increased payment. (Appellant Br. 22.) Per the claim, this constituted a repudiation of the Loan Modification Agreement between the parties, effectively relieving the Morettis of any obligation to continue payment and entitling them to recovery.

However, as discussed at length by the district court, repudiation of a contract requires more than confusion or misunderstanding. To repudiate a contract, a party must "unequivocally declare[] the intent not to perform[.]" *Appalachian Railcar Servs., Inc. v. Boatright Enters., Inc.*, 602 F. Supp. 2d 829, 879 (W.D. Mich. 2008) (quoting *Skladanowski v. Clear Channel Radio*, No. 261004, 2006 WL 3682184, at *1 n.2 (Mich. Ct. App. Dec. 14, 2006)). The Morettis have put forward no evidence, written or otherwise, wherein Defendants declare an intent not to perform their responsibilities under the Loan Modification Agreement. At best, the Morettis can point to areas of confusion. While Defendants' letters and statements in May and July 2009 were far from models of clarity, viewed in light of the requirements set out in the note, mortgage, and loan modification, these communications were consistent with the Morettis' contract. (R.73, PageID #1261-62 (wherein the district court explains that "the written documents from May, I think by the plaintiff's own admission, don't repudiate the agreement, don't pull back the $1,300

payment, but rather do what actually some of the other loan documents require. . . . [B]ecause it's a variable rate, there is something in the note that obligates the lender to present amortization scenarios so that the borrower knows what he or she is getting into if they scroll ahead and don't increase payments.").)

The verbal communication between John Moretti and Defendants similarly fails to provide sufficient basis for repudiation. The district court discussed this evidence as follows:

> [W]hen I read the statements from Mr. Moretti, I think he's being honest in saying he was very confused, that he called the bank and he was clearly very frustrated, didn't feel like he was getting anywhere, but the common refrain—and it happens in multiple places—the common refrain is, you know, "We'll look into it and get back to you." . . . But just hearing that, "Okay, so you're confused, and I'll look into it," that doesn't repudiate anything.

(R.73, PageID #1262.) We agree. Absent any evidence of an unambiguous repudiation of the Loan Modification Agreement by Defendants, the Morettis have not established a genuine issue of material fact to be tried before a jury on this theory.

Finally, the Morettis claim that they are entitled to reformation of the Loan Modification Agreement on the basis of innocent misrepresentation. To establish an innocent misrepresentation, a party must show "(1) a representation in a transaction between two parties; (2) that is false; (3) that actually deceives the other party; (4) that the other party relied on; (5) that the other party suffered damage from; and (6) [that] the party making the misrepresentation benefitted from it." *In re Moiles*, 840 N.W.2d 790, 797 (Mich. Ct. App. 2013), *judgment rev'd in part, vacated in part on other grounds*, 843 N.W.2d 220 (Mich. 2014). Despite their subjective confusion regarding the communications with Defendants, the Morettis have not presented evidence that Defendants made any false representation regarding the Loan

Modification Agreement. Accordingly, this claim also fails to present a genuine issue of material fact for consideration by a jury.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's grant of summary judgment in favor of Defendants. We also deny the Morettis' request for attorney's fees and costs.