NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0610n.06

Case No. 13-4450

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 28, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STEVEN STOCKMAN, | ) | |
| Plaintiff-Appellee | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| GE LIFE, DISABILITY AND MEDICAL | ) | THE SOUTHERN DISTRICT OF |
| PLAN; METROPOLITAN LIFE | ) | OHIO |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | OPINION |
| | ) | |

BEFORE: BOGGS and DONALD, Circuit Judges; HOOD, District Judge.[*]

**PER CURIAM.**[1] Defendants-Appellants GE Life, Disability and Medical Plan ("Plan")

and Metropolitan Life Insurance Company ("MetLife") appeal a district court decision granting

Plaintiff-Appellee's motion for judgment on the administrative record. In 2009, Plaintiff-

Appellee Steven Stockman ("Stockman") was injured in an accident and lost the use of his left

foot for one year. A series of surgeries partially restored Stockman's use of the foot, but it

remains permanently damaged. Stockman, a beneficiary under the Plan, submitted a claim for

benefits, but the Plan's administrator, MetLife, denied the claim, determining that any loss that

Stockman experienced was neither "permanent" nor "total" and therefore did not qualify for

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]Judge Boggs has filed a separate dissent.

coverage under the policy. After exhausting his administrative remedies, Stockman sued the Plan and MetLife for coverage under the Employee Retirement Security Act of 1974 ("ERISA"). The district court granted Stockman's motion for judgment on the administrative record and denied MetLife and the Plan's cross-motion, concluding that Stockman's injury fell within the Plan's promise that "the permanent and total loss of function of the hand or foot as a result of an accident after the loss has continued for at least 12 consecutive months" would be covered. MetLife and the Plan timely appealed. For the following reasons, we **AFFIRM**.

## I.

## A.

Near midnight on October 19, 2009, Steven Stockman fell two stories from a ladder while he was attempting to change a light bulb in his home. Stockman "landed on his feet, and experienced immediate pain in his left foot." Stockman's wife, Nicky Leonard ("Leonard"), drove him to the hospital, where he was admitted to the emergency room and initially diagnosed with a severe ankle sprain. A subsequent x-ray revealed, however, that Stockman had shattered his heel bone.[2]

Stockman began treatment with Michael Barnett ("Dr. Barnett"), an orthopedic surgeon, on November 3, 2009. Dr. Barnett affirmed the hospital radiologist's conclusion that Stockman suffered from "a left calcaneus fracture, a fracture of the heel bone." Dr. Barnett also diagnosed Stockman "with a right knee abscess that was draining purulent material," which had developed from Stockman's having to crawl on his knee to get around his home. Treatment of the abscess delayed surgery on Stockman's heel fracture, and Stockman developed infections of the bone

---

[2]"Stockman had a comminuted calcaneal fracture with soft tissue swelling."

and surrounding soft tissue, as well as an inflammation of the tissue on the bottom of his foot, after the surgery.[3]

As a result of his injury, Stockman underwent seven surgeries to repair his foot beginning November 12, 2009, and continuing through June 25, 2010.[4] Stockman's foot could not bear weight during this time. On July 1, 2010, nine months after the injury, Dr. Barnett concluded that Stockman's foot was "completely non-weight bearing" and that he was unable to use the foot. On July 20, 2010, Dr. Barnett referred Stockman to a plastic surgeon, having concluded that his wound was not healing properly. On September 14, 2010, Stockman was "not putting any weight" on his left foot, and Dr. Barnett gave him a handicap placard to help him perform daily life activities. Stockman was still unable to put weight on his foot when Dr. Barnett next saw him the following month.

On November 9, 2010, Stockman had a follow-up appointment with Dr. Barnett, whose notes from that visit state:

> [Stockman] knows that he will never have a normal foot again and may end up with chronic disability from this injury, but he is very happy that he still has his foot and was thankful to me for saving it for him.

---

[3]Throughout his treatment with Dr. Barnett, Stockman was diagnosed with calcaneal osteomyelitis (bone infection), left plantar fasciitis (inflammation of the tissue at the bottom of the foot), traumatic arthropathy of the left subtalar joint (arthritis in the joint between the calcaneus and talus), and cellulitis (soft tissue infection) of the left foot.

[4]Specifically, Stockman's surgeries were: (1) a November 12, 2009, open reduction internal fixation of the calcaneus fracture (placing the fractured fragments of the bone back in anatomic position and putting plates and screws inside of the foot to try and hold the bone together until the bone is able to heal and bear weight); (2) a January 19, 2010, irrigation and debridement to take way non-viable tissue due to infection; (3) a second irrigation and debridement; (4) a third debridement performed on January 26, 2010—as a result of the third debridement, Doctor Barnett placed a cement spacer containing antibiotics inside of Stockman's foot "to try to elute antibiotics over the course of the next eight weeks while [Stockman was] being treated by the infectious disease service with the IV antibiotics"; (5) a June 25, 2010, repeat irrigation and debridement where Dr. Barnett removed the cement spacer; (6) a repeat debridement and irrigation; and (7) a wound vacuum system procedure performed by plastic surgeon, Dr. Michael Johnson.

Dr. Barnett also told Stockman to "get out as much as he can on his foot to try and get weight back on [his foot]" and that if Stockman started to "put[] weight on [the foot] the bone should start to feel better." Dr. Barnett stated that he believed Stockman was "very scared to do so" and referred him to a physical therapist who he believed could help Stockman. In a sworn statement, Dr. Barnett asserted that he believed that the destruction of Stockman's left heel bone was "permanent."

The following year, Dr. Barnett noted that on May 23, 2011, Stockman walked into his appointment, but that he "still had severe sharp pain in his heel" and "even had to put his foot up on the table." On August 30, 2011, the date of Stockman's last visit, Dr. Barnett noted that Stockman was able to limp into the office.[5] At the time, Stockman did not have a cane; he was provided one shortly thereafter, and Dr. Barnett expects that Stockman will have to use it for rest of his life.

Dr. Barnett concluded that Stockman's injury resulted "in a loss of normal function" because Stockman could not use his foot "for propulsion, for locomotion," or "to get around." When questioned about Stockman's injury and the Plan, Dr. Barnett asserted that Stockman's loss of normal function had been continuous for at least 12 consecutive months and that he believed "Stockman would have met the definition that the MetLife policy lays out." Though Dr. Barnett stated that Stockman can "still use [his foot]," he clarified that Stockman will likely require "an assistive device of some kind such as a cane and possibly even a scooter if a traumatic arthritis worsens over time."

---

[5]In a sworn statement, Dr. Barnett observed that Stockman "had gained some mild use of his foot to the point where he was able to walk with an antalgic gait into [Dr. Barnett's] office without any assistive devices."

B.

1.

At the time of Stockman's injury, his wife, was a GE employee covered by the company's dependent accidental death or dismemberment benefit plan. On November 9, 2010, a little over a year after the accident, she submitted a claim for benefits on Stockman's behalf. The claim included a statement from Stockman that he had had "no use of his left foot" since the accident. It also included Dr. Barnett's statement as Stockman's attending physician explaining that Stockman had suffered "several set backs [*sic*] and complications . . . including multiple infections" following the injury. Dr. Barnett's statement also indicated that Stockman had not been able to bear weight on his left foot since November 3, 2009.

On May 31, 2011, MetLife sent a letter advising Leonard and Stockman that it had received the claim. The letter went on to explain that MetLife needed more information "regarding the extent of [Stockman]'s injury(ies)." Under the policy,[6] a "[l]oss of hand or foot means the hand or foot is severed at or above the wrist or ankle joint, or means the permanent and total loss of function of the hand or foot as a result of an accident after the loss has continued for at least 12 consecutive months." MetLife claimed that the documentation that had been provided was not conclusive regarding a "permanent and total loss of function" that had "continued for at least 12 consecutive months." MetLife requested additional documentation to meet the requirements. MetLife claims that it received no additional documentation following its request. Stockman claims that he provided the emergency room visit notes, surgery and

---

[6]MetLife's letter quotes Section 1.3.1 of the GE Benefits Handbook for Exempt and Nonexempt Employees Eligible to Participate in GE Life Insurance and Disability Benefits.

procedure reports, and other documentation following MetLife's request for additional documentation.[7]

In a letter dated August 9, 2011, MetLife denied Stockman's claim for benefits. MetLife stated that the claim "must be denied" because they had "not been provided evidence that the 'loss continued for at least 12 consecutive months' as is required under the Plan." MetLife reiterated that a covered "loss" entails "the permanent and total loss of function of the . . . foot as a result of an accident after the loss has continued for at least 12 consecutive months." The letter also explained Stockman had the right to appeal the decision within 60 days by submitting a written request for appeal to MetLife. In the event that the appeal was denied in whole or in part, Stockman was informed that he had the right to bring a civil action pursuant to Section 502(a) of ERISA.

2.

On October 13, 2011, MetLife received Mr. Stockman's appeal. The eleven-page appeal included "about 1000 pages of additional medical records" and a sworn statement from Dr. Barnett detailing Stockman's diagnoses and treatments. Stockman also submitted notes from his in-home nursing care provider documenting that he received continuous in-home health care and treatment from June 30, 2010, through November 16, 2010. Also submitted were photographs of Stockman's injured foot taken between September 2011 and October 2011, and CT images injury taken in 2011.

In addition to these documents, Stockman included a personal statement in which he described how the injury affects his daily life. Stockman stated that the "quality of life as [he] knew it was gone," that he "spent every minute of every day in constant pain," and was unable to

---

[7] At some point following the filing of Stockman's claim, MetLife received the treatment notes from Stockman's emergency room visit, reports for surgeries and procedures that were performed following his fracture and subsequent infection, and a physical therapy evaluation.

do "simple things" in life. Specifically, Stockman noted that he will never run, jump, ride bikes, walk, or go bowling with his children and wife again. Stockman explained that he takes eight Vicodin pills each day for "minimal" pain relief, medicine that he must take two-to-three hours ahead of time if he needs to venture out of his home. Stockman also reiterated that, during the period between the accident on October 20, 2009, and October 20, 2010, he had continuous surgeries, had no use of his left foot, and used a small four-wheel push scooter to get around to prevent his foot from touching the ground or bearing weight on his left foot.

Upon receipt of the additional documentation, MetLife directed Dr. Elyssa Del Valle ("Dr. Del Valle") to complete a medical referral review on Stockman's claim. In her subsequent report, Dr. Del Valle stated that, "[w]ithin a reasonable degree of medical certainty, it can be determined that the injury sustained on 10/20/09 . . . resulted in a permanent loss of normal function of [Stockman's] foot." She also noted, however, that Stockman retained "some functionality of the left foot" and that he could "weight bear with limitations and [could] walk with a cane." Dr. Del Valle concluded that "if total loss of function means total inability to perform activities attributed to feet such as stand, walk and for locomotion, then [Stockman did] not have total loss of function as he [was] capable of walking and standing." She further concluded that, "within a reasonable degree of certainty," Stockman "did have total loss of function of the left foot for a period of more than 12 months."

Following the report from Dr. Del Valle, MetLife sent Stockman a letter dated November 22, 2011, upholding the denial of his claim. The letter cited Stockman's ability to walk into his appointments with Dr. Barnett on May 23, 2011, and August 30, 2011, as proof that Stockman "has use and function of his left foot." Unlike its first denial, MetLife's second denial seemed to concede that Stockman lost use and function of his left foot for twelve consecutive months, but

alternately concluded that because he was able to walk without an assistive device at some point following those initial twelve months, the loss was not "permanent and total" as required by the Plan. Because this reason for denial differed from the reason in MetLife's first denial of benefits, MetLife allowed Mr. Stockman a second opportunity to appeal. As with the first appeal, Stockman would have to provide additional documentation within 60 days of receipt of the letter, and if the appeal was denied in whole or in part, he would have the right to file a civil action pursuant to Section 502(a) of ERISA.

3.

In a letter dated December 19, 2011,[8] Stockman's attorney notified MetLife that it was Stockman's position that he had exhausted all of his administrative remedies. Stockman requested that MetLife treat the letter as his formal appeal and asked that MetLife take any steps necessary to exhaust his administrative remedies. Stockman did not provide any additional documentation with the December 19, 2011, letter as he did "not have any additional documentation to submit." The letter also stated that if MetLife's position did not change, Stockman would "promptly file suit directly after receiving that response."

In an appeal review form dated January 6, 2012, MetLife noted that it had re-examined Stockman's claim and stated that his most recent letter did not "provide any additional points of appeal" or "include any additional documentation to support an appeal." Relying on the information in the previously submitted appeal, MetLife concluded that "though [Stockman's injury] did continue for 12 consecutive months, [the injury] was neither permanent [n]or total, which [was] required by the plan." MetLife upheld its previous denial of claim benefits and notified Stockman that he had the right to file a civil action.

---

[8]The record indicates that MetLife received the letter on January 3, 2012.

C.

Stockman filed his complaint in federal district court on February 22, 2012. Both parties moved for judgment on the administrative record on October 19, 2012. On November 30, 2012, they both also filed responses to the motions. Stockman argued that MetLife's decision to deny his claim was flawed for two reasons: (1) MetLife failed to interpret the phrase "total loss of function" in the "ordinary and popular sense" as required by law; and (2) MetLife failed to look at the full administrative record, instead only taking into account "a few select statements of a treating physician . . . and crafted a denial around them." Stockman insisted that the administrative record before the district court—and before MetLife at the time of its denial— "demonstrates that when the terms of the Plan are applied in their 'plain and ordinary sense,' the injury to Mr. Stockman's foot constitutes a 'total loss of function' and he is entitled to a judgment on the record and an award of AD&D benefits in the amount of $125,000.00, plus interest from the date of loss and costs of this action."

Conversely, MetLife argued that its denial of Stockman's claim for dismemberment benefits was proper. MetLife relied heavily on statements made by Dr. Barnett in which he noted that "Plaintiff was able to walk on his foot and could even do so for lengthy periods." MetLife argued that because the Plan pays dismemberment benefits "only where a foot has been severed at or above the ankle, or where there has been a 'permanent and total loss of function'" and because Stockman's foot was not severed, the administrative record, including Dr. Barnett's statement, demonstrated that Stockman's injury did not result in a "permanent and total loss of use of his foot."

On September 27, 2013, the district court issued an opinion granting Stockman summary judgment on the administrative record and overruling the defendants' motion for the same. The

district court first noted that that it was undisputed that Stockman could only receive claim benefits under the second clause of the Plan's definition of "loss"—*i.e.*, that it had been clear from the outset that Stockman's foot had not been "severed at or above the . . . ankle joint," but that the clause at issue was "the permanent and total loss of function of the hand or foot as a result of an accident after the loss has continued for at least 12 consecutive months." In particular, the court noted that as of the date of Stockman's initial claim under the policy, he clearly fit within the Plan's definition of "loss":

> The court's review of the administrative record shows that on November 9, 2010, over twelve consecutive months had passed, during which period of time Stockman could not place any weight on his foot without excruciating pain that required heavy doses of pain medication. That finding accords with the policy definition of a permanent and total loss of function of Stockman's foot, after the loss had continued for at least 12 consecutive months.

While the court acknowledged Dr. Barnett's statements that Stockman had been able to ambulate, it emphasized that Dr. Barnett's statements needed to be taken in context, and that MetLife's reliance on "minimal improvements in weight bearing and ambulation that [Stockman] was able to achieve 19 to 22 months after the accident" and the "mere fact that [Mr.] Stockman's foot was still attached to his body" were not sufficient to "demonstrate functionality." The district court also highlighted that MetLife's own physician reviewer, Dr. Del Valle, had concluded that Stockman's "total loss of function following the accident was for more than 12 consecutive months," supporting an award of benefits under the definition in the Plan.

The district court was particularly concerned that MetLife changed its reason for denial between Stockman's initial claim and his appeal some months later. As discussed, on November 9, 2010, the date of Stockman's application for benefits, over twelve consecutive months had

passed in which he could not bear weight on his foot. MetLife denied that claim on August 9, 2011, on the grounds that, "according to the information provided to MetLife, [it had] not been provided with evidence that the 'loss has continued for at least 12 consecutive months' as is required under the Plan." Stockman appealed, and after MetLife's own physician reviewer concluded that he had indeed had a "total loss of function following the accident [] for more than 12 consecutive months," MetLife denied his appeal on the grounds that "the loss is not 'permanent and total,' as is required by the term of the Plan[.]"

> Defendants cannot use the word "permanent" in the definition of loss to evade the definition's criterion that, once the "permanent and total loss of function" has lasted for twelve consecutive months, the beneficiary is entitled to benefits. Such a reading would allow Defendants to point to any minimal improvement, after twelve consecutive months and eligibility has been established, as a basis for denying eligibility. Furthermore, to the extent that "permanent" and "continued for at least 12 consecutive months," as conditions of loss, create an ambiguity, the Court must construe the language in Stockman's favor.

Ultimately, the district court concluded that Stockman "suffered a 'permanent and total loss of function' of his foot, and that the loss continued for at least twelve months after the date of his injury." Accordingly, the district court found for Stockman. MetLife timely appealed.

II.

A.

The underlying purpose of ERISA is to protect "the interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)). Both the district court and this Court review de novo a plan administrator's denial of ERISA benefits, unless the benefit plan gives the plan administrator discretionary authority to

determine eligibility for benefits or to construe the terms of the plan. *See Firestone*, 489 U.S. at 115. This de novo standard of review applies to the plan administrator's factual determinations as well as his legal conclusions. *See Rowan v. Unum Life Ins. Co.*, 119 F.3d 433, 435 (6th Cir. 1997).

The language in an insurance policy "is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended." *Comerica Bank v. Lexington, Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993). "[T]he terms of an ERISA plan [are to] be interpreted in an ordinary and popular sense, and [] any ambiguities in the language of the plan [are to] be construed strictly against the drafter of the plan." *Regents of Univ. of Mich. v. Empls. of Agency Rent–a–Car Hosp., Ass'n.*, 122 F.3d 336, 339-40 (6th Cir. 1997). "A technical construction of a policy's language which would defeat a reasonable expectation of coverage is not favored . . . [and] an insurer has a duty to express clearly the limitations in its policy." *Id*. at 339.

When interpreting ERISA plan provisions, courts have at times gone beyond the actual language of the plan to ascertain the underlying intent. *See Citizens Ins. Co. of Am. v. MidMichigan Health ConnectCare Network Plan*, 449 F.3d 688, 692-93 (6th Cir. 2006). However, we have the "paramount responsibility in construing plan language . . . to ascertain and effectuate the underlying intent." *Id*. (citations omitted). Therefore, we must first reference the plan language itself, but may also consider reasonable inferences and presumptions under the particular circumstances of the claim. The language of a plan is ambiguous only "if it is subject to two reasonable interpretations." *Id*. at 694; *see also Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996). In other words, if Plan language, "however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be

ambiguous or, indeed, fatally unclear." *Reardon v. Kelly Servs., Inc.*, 210 F. App'x 456, 459 (6th Cir. 2006).

B.

In the case at bar, the specific language of the Plan defines loss of a foot as a foot that has been "severed at or above the . . . ankle joint, or means the permanent and total loss of function of the . . . foot as a result of an accident after the loss has continued for at least 12 consecutive months." At issue, essentially, is the following question: Does a "total loss" become "permanent" for purposes of triggering the Plan's coverage upon lasting for twelve consecutive months after an injury, or must an injury be both total and permanent to trigger coverage under the Plan, for which a twelve-month waiting period is simply a condition of eligibility? MetLife and the Plan say the answer is the latter; Stockman (and the district court), the former.

It is undisputed that Stockman's foot was not severed and that he seeks benefits pursuant to the portion of the plan that allows for recovery based on the "permanent and **total loss of function** . . . for at least 12 consecutive months." Reviewing the language of the Plan and the administrative record, we conclude that this relevant provision of the Plan is ambiguous or, in other words, subject to two reasonable interpretations.

Beginning with the second requirement, we find that Stockman did lose the use of his foot for twelve consecutive months. Following Stockman's initial claim for benefits on November 9, 2010, MetLife denied his claim because he had not submitted sufficient documentation to determine that he had suffered a "'loss [that had] continued for at least 12 consecutive months' as is required under the Plan." Assuming, without deciding, that this was in fact the case at the time of Stockman's initial application, we are satisfied that this was not the case following the submission of considerable additional documentation to the administrative

record during Stockman's first appeal (and MetLife's second denial). A review of the complete record reveals that between the date of the accident, October 20, 2009, and October 20, 2010, Stockman underwent numerous surgeries and had no use of his left foot, suffered from "multiple infections" following the injury, and received continuous in-home health care from June 30, 2010, through November 16, 2010. Both Stockman and Dr. Barnett stated that Stockman used a push scooter to get around to prevent his left foot from touching the ground or bearing weight. We find that, based on these facts, Stockman had a "total loss of function [of his left foot] . . . for at least 12 consecutive months." MetLife and the Plan do not dispute this interpretation on appeal.

The aspect of the Plan's language we question, however, is the first requirement—*i.e.*, that Stockman suffer a "permanent and total" loss of function to qualify for benefits. In particular, "permanent" is the term that renders the Plan language unclear in light of the other requirements of the provision.[9] As discussed, the parties offer different interpretations of this term in context. MetLife and the Plan concede that "Stockman submitted evidence that arguably shows a total loss of function for twelve months." They insist, however, that "none of the medical evidence . . . supports a finding that any total loss of function is permanent," and that "[t]here is no ambiguity in the Plan['s] equirements.]" Stockman counters that the district court's interpretation was correct: that the Plan language is susceptible to two reasonable interpretations, and asserts that the resulting ambiguity must be construed against MetLife and the Plan under the doctrine of *contra proferentem*. *See Marquette Gen. Hosp. v. Goodman Forest Indus.*, 315 F.3d 629, 632 & n.1 (6th Cir. 2003); *Regents of Univ. of Mich.*, 122 F.3d at

---

[9]The Court need not address the definitions of "total," "loss," and "function" as MetLife has not denied Stockman's claim for failure to satisfy those requirements.

339-40 ("[A]ny ambiguities in the language of the plan [are to] be construed strictly against the drafter of the plan.").

We find that the meaning of the term "permanent" is ambiguous in light of the other provisions of the policy. Simply put, a reading of the policy alone does not clarify which interpretation of the term is correct, and either interpretation is feasible under its terms. Federal law holds that we may use "traditional methods of contract interpretation to resolve th[at] ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence." *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993). We therefore begin with the "ordinary meaning" of the word "permanent." *Comerica Bank,* 3 F.3d at 942. Stockman argues that the dictionary definition of the word should apply. We agree. Webster's Dictionary defines "permanent" as something that is "continuing or enduring without fundamental or marked change: STABLE." *Merriam-Webster Online Dictionary* (http://www.merriam-webster.com/dictionary/permanent, last visited May 21, 2015).

MetLife counters that Stockman's injury was not "permanent" because he was able to walk without an assistive device at some point following the initial twelve-month period. However, we are unpersuaded that this alone means that Stockman's loss of use of his foot was not "continuing or enduring without fundamental or marked change." In his sworn statement, Dr. Barnett highlighted that Stockman's injury is not expected to improve:

> At this point [Stockman] is reaching what we call maximum medical improvement. I don't expect [Stockman]'s condition to get much better over the next few months or the next five years or even ten years. [Stockman] is far enough out from his surgeries that we can begin to predict what his level of functioning is going to be for the rest of his life. . . .
> I do expect [Stockman] for the rest of his life will require, at times, the brief use of a cane for brief periods, maybe he will not use anything at all but I do not anticipate him doing this for long periods of time."

Dr. Barnett also stated that "the destruction of [Stockman's] calcaneus [heel] is permanent" because, "from an orthopedic standpoint," Stockman "has loss of the bony tissue which can never recover or be rebuilt in any way." Stockman's condition is considered "chronic," which Dr. Barnett explained means "it is expected to be with the patient permanently." Finally, Dr. Barnett also acknowledged that the arthritis Stockman suffers as a result of the accident "may, in fact, be progressive. . . . Arthritis will tend to get worse over time; therefore, I am expecting [Stockman] to have future problems with the subtalar arthritis that he experienced after the trauma. . . . He'll likely need an assistive device . . . if traumatic arthritis worsens over time." To the extent Stockman's condition is not "stable," it will only get worse.

Additionally, we note that there is no indication that using this definition causes the reading of the whole instrument to have a different or special meaning than what was intended. *See Comerica*, 3 F.3d at 942. There is in fact more than one plausible reading of the provision. Addressing MetLife's proffered example, where a Plan participant suffers a broken hand in January 2012, the hand is still in a rigid cast and totally immobile in January 2013, the claimant files for benefits on February 1, 2013, and the cast comes off and the claimant regains full use of his hand by March 1, 2013, we find the instant case is distinguishable. Unlike the Plan participant in MetLife's example, it is undisputed that Stockman has not regained full use of his foot. Quite the opposite: both Dr. Barnett and Dr. Del Valle have, based on their extensive medical knowledge, determined that Stockman will never regain normal use of his foot again. If Stockman's injury, which has resulted in the "permanent" loss of the use of his foot in the way that a foot should be used does not qualify him to receive benefits, we are unsure of a situation, absent actual severance, where a claimant would qualify.

It is not our intention to convert the dismemberment Plan into a disability plan, to fundamentally and improperly alter the Plan, or to read the term "permanent" in a way that would render it superfluous. However, based on the facts in this particular case, we conclude that the word "permanent," if interpreted in the way urged by the Plan and MetLife, will create an insurmountable requirement to claim benefits. As emphasized by the district court, to hold otherwise "would allow Defendants to point to any minimal improvement, after twelve consecutive months and eligibility has been established, as a basis for denying eligibility." Though we acknowledge MetLife's argument that "dismemberment is permanent and total," the Plan explicitly allows for the recovery of benefits when a person has suffered an injury that, for all intents and purposes, has resulted in the loss of the use of the foot to the point where it no longer serves the purpose it was intended to serve and will never be able to serve that purpose again.

It is undisputed that Stockman had a total loss of the function of his foot for at least twelve months, consecutively. "[T]he terms of an ERISA plan [are to] be interpreted in an ordinary and popular sense, and [] any ambiguities in the language of the plan [are to] be construed strictly against the drafter of the plan." *Regents of Univ. of Mich.*, 122 F.3d at 340. Construing the language of the dismemberment provision in MetLife's plan according to the ordinary sense of its language and resolving ambiguities against the drafter, we find it inescapable that MetLife's reading of the provision is incorrect in this case, and that Stockman is qualified to receive benefits because he has suffered a "permanent and total loss of function of [his] . . . foot as a result of an accident after the loss . . . continued for at least 12 consecutive months."

III.

Accordingly, we **AFFIRM** the judgment of the district court and **REMAND** the case for a determination of attorney fees.

BOGGS, Circuit Judge, dissenting. The provision of the Accidental Death or Dismemberment Insurance policy (the "Plan") relevant here provides that benefits will be paid for accidental "loss of foot," which "means the permanent and total loss of function of the . . . foot as a result of an accident after the loss has continued for at least 12 consecutive months." This provision requires three things: (1) a *permanent* loss of the function of the foot; (2) a loss that is *total*; and (3) a loss that has continued for twelve months. By the plain language of the policy, each requirement is independent.

In the ordinary case, a severe injury can be seen to cause a total and permanent loss of function, and payments will begin as soon as the twelve-month period expires. However, it is quite plausible for a loss of function to be total for a while but then be subject to some improvement, even if that improvement takes more than twelve months to manifest. That is what happened here. Stockman's foot was badly injured. He lost all function for a while but was expected to improve. That improvement took more than twelve months but there is no doubt that it occurred. Stockman can now use his foot to get around, ambulate with a cane or with a limp at times, and bear some weight as his doctor expected. He does not have "normal" function of his foot, and never will—but he is able to use his foot to a reasonable extent and thus his permanent loss of function is far from total. He is therefore not entitled to dismemberment benefits. If he wanted a disability policy, he could have bought one. He did not.

The majority at some points reads the Plan as though it says "total loss of function for at least twelve months," even if not permanent. *See* Maj. Op. at 17. It doesn't. At other points, the majority reads the Plan as if it says "permanent loss of *normal* function." *See id.* at 4, 16. It doesn't. I therefore respectfully dissent.

I

In order to establish the proper context, I offer a brief recitation of the factual background of Stockman's claim.

A

On October 19, 2009, Stockman fell from a ladder while changing a light bulb and shattered his left calcaneus, or heel bone. The office notes of Stockman's surgeon, Dr. Barnett, from less than a month after the accident explain that Stockman "has been nonweightbearing on his left side, but has had a shooting pain all throughout his heel, especially with weightbearing." Records from January 7, 2010, state that, while Stockman had remained nonweightbearing to that point, "[h]e will be allowed to begin weightbearing in one weeks [sic] time." Dr. Barnett also opined that Stockman's "pain will go down once he bears more weight on his left side." However, due to a continuing infection in the wound and multiple irrigation and debridement procedures, Stockman remained nonweightbearing for several months.

In a follow-up visit on June 22, 2010, Dr. Barnett noted that Stockman's wound was still "nonhealing," but had "dramatically improved." At this time, Stockman "had been nonweightbearing using a wheeled knee walker," and, though his pain was "well tolerated," it became "worse with attempts at weightbearing." On October 12, 2010, nearly a year following the accident, Stockman's wound was "doing great," but he was still not putting any weight on his foot and was using a wheeled knee walker. Stockman's "refus[al] to bear weight" at this point made Dr. Barnett "concerned."

In November 2010, Stockman reported "a great deal of difficulty walking on his foot" and pain that was "worse with weightbearing." Dr. Barnett observed "no obvious significant other issues besides swelling when [Stockman] has been ambulating for quite awhile [sic]."

During this visit, Stockman again "refuse[d] to bear weight" on his foot. Significantly, in his report, Dr. Barnett stressed that:

> I believe *[Stockman] needs to get out and do as much as he can on his foot to try and get weight back on there*. I offered him physical therapy and he accepted. He will go . . . [to] physical therapy and have them *work with him on getting his range of motion, strength and gait going again. I believe all of the time that he had off has really restricted him. I believe if he gets out and starts putting weight on this that the bone should start to feel better*. I know he is very scared to do so and I believe the therapist will help him. . . . However, he knows that *he will never have a normal foot again and may end up with chronic disability from this injury but he is very happy that he still has his foot* and he was thankful to me for saving his [foot] for him.

(emphases added).

Several months later in May 2011, Dr. Barnett noted that Stockman was "putting full weight" on his foot and came into his office "walking today without any assistive devices," though with a "mild antalgic gait on his left side." At this time, Stockman was not taking any narcotic pain medications. Dr. Barnett's final records from August 30, 2011, indicate that Stockman complained of "constant pain that is unbearable," and that Stockman's condition was aggravated by weightbearing and relieved by elevation. However, Dr. Barnett's assessment notes that Stockman's weightbearing status was "full," that Stockman was issued a cane to help with walking, and that Dr. Barnett would "try [physical therapy] for now" as the recommended treatment plan.

B

In a sworn statement given on September 27, 2011, Dr. Barnett noted that it was not "typical" for patients suffering from a fractured calcaneus to be nonweightbearing for such a long period. According to Dr. Barnett, such patients typically "begin weight bearing approximately eight to ten weeks after their [surgery]" and "ge[t] back to as normal function as they can within a couple of months." Stockman, however, did not heal in the typical timeframe

and "was unable to get back to full weight bearing during" the first half of 2010 "due to the infections and the multiple surgeries which he needed."

Dr. Barnett reiterated his "opinion that [Stockman] will never have a *normal* foot," explaining that Stockman "can expect to have *some functional impairment* as time goes on." (emphases added). Dr. Barnett agreed that Stockman has not made "a total recovery" and has not "regained 50 percent of the capacity that he had" prior to the accident. Stockman was not expected to improve much going forward; however, as of August 30, 2011, Stockman had "gained some mild use of his foot to the point where he was able to walk with an antalgic gait [that is, a limp] into [Dr. Barnett's] office without any assistive devices." Dr. Barnett expected that Stockman "for the rest of his life will require, at times, the use of a cane for brief periods, maybe he will not use anything at all but I do not anticipate him doing this for long periods of time."

Regarding the relevant language of the Plan, Dr. Barnett agreed that the "destruction of [Stockman's] calcaneus" was "permanent" due to "loss of the bony tissue which can never recover or be rebuilt." Regarding functionality, Dr. Barnett defined "the function of a foot" as being "mainly used for propulsion, for locomotion, . . . to get around." When addressing the Plan's requirement of "a total loss of function," Dr. Barnett stated that he would consider Stockman's condition to be "a loss of *normal* function." (emphasis added). Dr. Barnett also confirmed that Stockman was under care for his condition "for at least 12 consecutive months" and identified Stockman's condition as "chronic," in that it "is expected to be with the patient permanently." Regarding Stockman's future, Dr. Barnett opined that he "has a relatively poor prognosis" and "will have difficulty walking [around] the mall and doing shopping" and will "likely need an assistive device of some kind such as a cane." When asked about Stockman's

weightbearing and whether his foot is "useful or beneficial to him," Dr. Barnett stated that Stockman was not going to have the capabilities of "jumping, running, [or] normal locomotion without a limp . . . going forward." However, Dr. Barnett stressed that "it's incredibly useful and incredibly beneficial to still have your foot on your body," and that Stockman "*can still use [his foot] to get around.*" (emphasis added).

MetLife's expert, Dr. Del Valle, determined "[w]ithin a reasonable degree of medical certainty" that Stockman's injury "resulted in permanent loss of *normal* function of his foot. He however has some functionality of the left foot in that he can weight bear [sic] with limitations and can walk with [a] cane. He thus has some functionality of his left foot, and thus it is not [a] total loss of function." (emphasis added). Regarding Dr. Barnett's conclusions, Dr. Del Valle observed that "*[l]oss of normal function as noted by Dr. Barnett is not equivalent to total loss of function.*" (emphasis added). The "[f]unctionality of [Stockman's] left foot is significantly limited," but he does not suffer from a "total loss of function or [else] he would be unable to bear weight and ambulate with or without assistive devices."

Dr. Del Valle did conclude that in the twelve-month period immediately following the accident, Stockman had a "total loss of function of his left foot as he was instructed to be non weight bearing [sic]." However, Stockman's "functionality improved" following the surgical procedures and healing "more than 12 months after the accident." Because Stockman's ability to bear weight and ability for locomotion returned, "his [total] loss proved to not . . . be permanent."

II

When interpreting the language of an ERISA plan, this court will apply the plain meaning of the plan's language to give effect to its unambiguous terms. *Farhner v. United Transp. Union*

*Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011). Plain meaning refers to the language as it would be understood by an ordinary person. *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 332 (6th Cir. 2009). While any ambiguities in the plan's language should be construed against the insurer, we must "not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990).

## III

The Plan under which Stockman claimed benefits includes an Accidental Death or Dismemberment Insurance policy, which, unsurprisingly, "pays benefits in case of an accidental death or dismemberment." The applicable policy is thus explicitly a dismemberment policy, and not a disability plan. Included under the relevant provision for "dismemberment benefits" is coverage for "loss of foot," which "means the . . . foot is severed at or above the . . . ankle joint, or means the permanent and total loss of function of the . . . foot as a result of an accident after the loss has continued for at least 12 consecutive months." There is no dispute that Stockman's foot was not severed; thus, he can only be eligible under the "loss of function" portion of the Plan.

According to MetLife, the plain language of this provision requires that Stockman's loss of function be i) permanent; *and* ii) total; *and* iii) one that has continued for at least twelve consecutive months. I agree. Thus, a beneficiary can suffer from a severe injury that is nonetheless ineligible for dismemberment benefits because the resulting loss of function is total but not permanently so; or is permanent but not total; or is both total and permanent but has not yet been present for twelve consecutive months following the causal accident.

A

The central point of contention regarding the proposed interpretations of the Plan offered by Stockman, MetLife, and the majority opinion involves the interaction between the terms "permanent" and "continued for at least 12 consecutive months." The majority determines that the word "permanent" renders the Plan ambiguous "in light of the other provisions of the policy." Maj. Op. at 15. Apparently, in the majority's view, interpreting the world "permanent" according to its plain meaning would conflict with the twelve-consecutive-months language and "create an insurmountable requirement to claim benefits." *Id.* at 17. This is not so. Under the most plausible understanding of the Plan based on its plain terms, each of the Plan's requirements—i.e., that the loss of function be total, permanent, and one that has continued for at least twelve consecutive months—operates quite comfortably alongside one another.[1]

All parties seem to agree that *function* in this context refers to using a foot for weightbearing and ambulation, or "to get around." *See id.* at 4. Thus, a *total* loss of function would be characterized by an "absolute" or "utter" loss of the ability to bear weight and get around using the injured foot. Webster's Third New International Dictionary 2414 (1986) (defining "total" as "unqualified in extent or degree; absolute; utter"). And such a loss would be

---

[1] The majority asserts that the Plan is ambiguous because it "is susceptible to two reasonable interpretations." Maj. Op. at 14. Any interpretation of the Plan that reads out or significantly undermines the Plan's express requirement that the loss of function be permanent, however, should not be considered reasonable so long as a sensible interpretation that gives meaning to each of the Plan's terms exists. *See Adams v. Anheuser-Busch Cos.*, 758 F.3d 743, 748 (6th Cir. 2014) ("The mere fact that parties propose competing interpretations of language in a[n ERISA] Plan 'does not dictate a finding that the provision is ambiguous.' Rather, 'the alternative interpretation . . . must be a plausible one.'" (omission in original) (quoting *Shelby Cty. Health Care Corp. v. Majestic Star Casino, LLC Grp. Health Benefit Plan*, 581 F.3d 355, 370 (6th Cir. 2009))); *Marquette Gen. Hosp. v. Goodman Forest Indus.*, 315 F.3d 629, 632 n.1 (6th Cir. 2003) ("Disagreement between the parties as to an interpretation of the language does not create ambiguity in the legal sense.").

*permanent* if it were "continuing or enduring . . . without fundamental or marked change" and "not subject to fluctuation or alteration." *Id.* at 1683 (defining "permanent").[2]

The twelve-month time frame serves as a waiting period during which a beneficiary cannot receive benefits even if he alleges that he suffered a total and permanent loss. It reflects a determination that any final assessment of the extent and nature of a loss of function not be made for at least one year, providing confidence that the assessment is made to a reasonable degree of medical certainty and is based on sufficient evidence. The Plan's use of the phrasing "*after the loss has continued* for at least 12 consecutive months" supports the understanding that the twelve-month language describes a separate evidentiary requirement, rather than modifies the definition of "loss" in the same way as do the terms "permanent" and "total." In this way, the twelve-month requirement does not undermine or cabin the Plan's requirement that a covered loss be "permanent," but in fact operates comfortably alongside it. Adopting this interpretation would therefore best fulfill our duty to "give effect to the unambiguous terms of an ERISA plan." *Lake v. Metro. Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir. 1996). In the majority's reading, by contrast, total loss for thirteen months would result in eligibility for benefits even if all agreed that the injured foot would become wholly normal in the fourteenth month and it in fact becomes so. That is not a plausible reading of the Plan.

---

[2] Stockman criticizes such an understanding of the term "permanent" as necessitating an "essentially . . . unknowable" determination that a loss of function will "last indefinitely without change." Appellee Br. 38. It is of course true that a beneficiary cannot demonstrate to an absolute degree of certainty that a loss of function—or anything else for that matter—will last forever, but this is not what the Plan requires. Rather, as is necessary in determining whether a loss is "total" or "has continued for at least 12 consecutive months," the permanence inquiry requires the exercise of reasoned judgment based on medical evidence. The use of such a "medical or technical perspective," *id.* at 36, does not undermine the plain meaning of the Plan's language, but rather simply reflects that medical evidence is important and indeed necessary in determining whether a beneficiary qualifies for dismemberment benefits, as Stockman's own reliance on medical records and expert testimony demonstrates.

The majority disclaims any intent "to read the term 'permanent' in a way that would render it superfluous." Maj. Op. at 17. Yet, even in framing the question presented by Stockman's appeal, the majority asks: "Does a 'total loss' become 'permanent' for purposes of triggering the Plan's coverage upon lasting for twelve consecutive months after an injury, or must an injury be both total and permanent to trigger coverage under the Plan . . . ?" *Id.* at 13. Even though the Plan flatly requires a "permanent and total loss of function," the majority ultimately opts for the former interpretation over the latter. If defining the term "permanent" to mean "lasting for twelve consecutive months" does not render that term superfluous, I am not sure what would—the provision would read the same whether or not the word "permanent" appeared. *Cf. id.* at 15 (recognizing dictionary definition of permanent as "continuing or enduring without fundamental or marked change"). Indeed, the majority goes on to hold that Stockman is qualified to receive benefits because "[i]t is undisputed that Stockman had a total loss of the function of his foot for at least twelve months, consecutively." *Id.* at 17. By this point, "permanent" has disappeared entirely from the majority's analysis.

The majority's interpretation essentially converts the Plan's definition of loss into "a total loss of the function of [the] foot for at least twelve months," *ibid.*, whether or not the loss is permanent—i.e., continuing or enduring without fundamental or marked change. This is not what the Plan says, and this court should not alter the terms of an ERISA plan because of supposed ambiguity when a perfectly sensible interpretation based on the plan's plain language exists. *See Adams v. Anheuser-Busch Cos.*, 758 F.3d 743, 748–49 (6th Cir. 2014) (determining that an ERISA plan had "only one plausible interpretation" when the relevant "provision is understood according to its ordinary meaning, and no term is ignored" or "rendered superfluous").

B

Under the proper understanding of the Plan based on its plain terms, it is clear that Stockman's injury, which certainly did "continu[e] for at least 12 consecutive months" following the accident, did not result in a permanent and total loss of function. The administrative record demonstrates that Stockman suffered both a total loss of function that was temporary (and thus not permanent), and thereafter a permanent loss of some function (and thus not total), but not a total *and* permanent loss of function as the Plan requires.

MetLife's own expert agreed that for the twelve-month period following the accident, Stockman had a "total loss of function of his left foot," as he was instructed to remain completely nonweightbearing because of significant pain exacerbated by attempts at ambulation. In the district court and the majority's view, this ended the matter: If MetLife were able to rely on Stockman's improved functionality "more than 12 months after the accident" to conclude that Stockman's "loss proved to not . . . be permanent," MetLife could "point to any minimal improvement, after twelve consecutive months and eligibility has been established, as a basis for denying eligibility." Maj. Op. at 11. Not so.

It would be problematic for an insurer to deny benefits based on some mild improvement that left little or no function in the foot, but that is not the situation here. The real issue is not that there was some "minimal improvement" in Stockman's condition, but rather that his condition was *expected to improve* enough—as it *ultimately did*—that, based on reasoned medical judgment, Stockman never suffered from a total loss of function that is *permanent*, given that he can now use his foot to get around, ambulate with a cane, and bear some weight *as his doctor anticipated*. Put differently, the record lacks any expressed expectation from the relevant time period that Stockman's total loss of function—demonstrated by the "absolute" or "utter"

inability to bear weight and ambulate—would continue "without fundamental or marked change."

Dr. Barnett's records from January 2010, less than three months after the accident, indicate his expectation that Stockman would "be allowed to begin weightbearing in one weeks [sic] time." This corresponds with Dr. Barnett's observation that individuals suffering from a fractured calcaneus typically "begin weight bearing approximately eight to ten weeks after their [surgery]" and "ge[t] back to as normal function as they can within a couple of months." Unquestionably, Stockman did not heal within the normal timeframe "due to the infections and the multiple surgeries which he needed." But there was no indication that these setbacks would constitute more than a temporary delay, albeit a significant one, in Stockman's ability to regain *some* function, which would render any permanent loss of function less than total. Indeed, by November 2010, Dr. Barnett recommended that Stockman "do as much as he can on his foot to try and get weight back on there," and believed that if Stockman "gets out and starts putting weight on this [then] the bone should start to feel better." It seems unlikely that a physician would make such a recommendation to a patient permanently suffering from the inability to bear weight and ambulate.

Stockman argues that his loss is permanent by stressing that he has suffered a "loss of the bony tissue" and "supporting structure" of his foot that "can never recover or be rebuilt in any way." Appellee Br. 31. The majority in effect adopts this argument, observing that "'the destruction of [Stockman's] calcaneus [heel] is permanent' because, 'from an orthopedic standpoint,' Stockman 'has loss of the bony tissue which can never recover or be rebuilt in any way.'" Maj. Op. at 16. This demonstrates only that Stockman suffers from a *physical injury* that is permanent. But, of course, that is not the relevant inquiry. We are concerned here with

- 29 -

whether the *loss of function* associated with that injury is permanent (and total). *Compare id.* at 2 (noting the Plan's requirement of a "permanent and total *loss of function* of the . . . foot"), *with id.* at 13 (framing the question as whether "an *injury* [must] be both total and permanent to trigger coverage under the Plan"), *and id.* at 4 ("[T]he *destruction of Stockman's left heel bone* was 'permanent.'") (emphases added). Indeed, at no point does the majority hold that Stockman's total loss of function is permanent as the Plan requires, nor could it. *Cf. id.* at 1 (Stockman "lost the use of his left foot *for one year*. A series of surgeries *partially restored Stockman's use of the foot*, but it remains permanently damaged."); *id.* at 16 ("Stockman has not regained *full use* of his foot.") (emphases added).

I do not foreclose the possibility that an individual could, under some circumstances, suffer a permanent, total loss of function resulting from an injury that would *typically* be expected to involve a recovery of function. However, that is not the case here.

C

Dr. Barnett's statements that Stockman will not have the "capabilities" of "jumping, running, [or] normal locomotion without a limp . . . going forward," "can expect to have some functional impairment as time goes on," "will have difficulty walking [around] the mall and doing shopping," and will "likely need an assistive device of some kind such as a cane" do not undermine this analysis. Rather, they are consistent with Dr. Barnett's conclusion, which is supported by MetLife's expert, that Stockman has suffered "a loss of *normal* function." But that is not sufficient to meet the Plan's requirement of a *total* loss of *function*.

The majority's observation that "for all intents and purposes," Stockman's foot "no longer serves the purpose it was intended to serve and will never be able to serve that purpose again," *id.* at 17, is contradicted by the administrative record and Dr. Barnett's own statement

that Stockman "*can still use [his foot] to get around.*" *See id.* at 4 (noting Dr. Barnett's opinion that Stockman can "still use [his foot]"). As Dr. Barnett expected from the beginning, Stockman retains *some* function in his injured foot. *See id.* at 1 ("A series of surgeries partially restored Stockman's use of the foot . . . .").[3] Stockman observes that his ability to stand and ambulate using his injured foot is "permanently limited," and that the functionality of his foot is "significantly limited" as a result. Appellee Br. 19, 21. However, permanent and *significant* loss of function is not permanent and *total* loss of function, which would be characterized by the "absolute" or "utter" loss of the ability to bear weight and get around.

The majority gets around this fact by once again accepting Stockman's invitation to alter the language of the Plan, converting the definition of loss into total ~~and permanent~~[4] loss of *normal* function. *See* Maj. Op. at 16 (extending coverage where the claimant "will never regain *normal use* of his foot again"); *id.* at 4 ("Dr. Barnett asserted that Stockman's loss of *normal function* had been continuous for at least 12 consecutive months . . . ."); Appellee Br. 35 (stressing Stockman's "loss of *normal function* permanently") (emphases added). That is not our proper role.[5]

---

[3] Indeed, Stockman's own narrative statement submitted to MetLife in October 2011 expressed that he had "*no* use of [his] left foot" between "October 20, 2009 and October 20, 2010," which is the twelve-month period following the accident, but as of October 2011 "do[es] not have *full* use of this foot."

[4] *See supra* Part III.A.

[5] The majority expresses concern that a plain-language interpretation of the Plan would "create an insurmountable requirement to claim benefits," Maj. Op. at 17, and posits that it is "unsure of a situation, absent actual severance, where a claimant would qualify" under MetLife's reading. *Id.* at 16. These concerns are overstated. Indeed, all parties, including MetLife's own expert, agree that Stockman *himself* suffered from a total loss of function for the twelve months following the accident, without actual severance. All that is preventing Stockman from meeting the Plan's requirements for coverage is the lack of expressed medical judgment that such total loss would continue "without fundamental or marked change" in the future. It is certainly

IV

I do not doubt the significant pain and suffering that Stockman's injury has caused and continues to cause him, nor the drastic impact that the injury has had upon his life. Nevertheless, the record establishes that, as his doctor expected, Stockman retains some ability to use his foot to bear weight and "get around," which is the ordinary understanding of the function of a foot. Thus, for the purposes of dismemberment-insurance benefits under the Plan, Stockman has not suffered a permanent and total loss of function. Stockman's injury certainly constitutes a significant disability, and some wording in a *disability* policy might support compensation. However, the requirement in Stockman's *dismemberment* policy that he suffer from a "loss of foot" is not met. I respectfully dissent.

---

possible to envision circumstances where a beneficiary with a similar injury (and a slightly worse prognosis) would be able to make this showing without suffering a severance.