PER CURIAM.[1]
Defendants-Appellants GE Life, Disability and Medical Plan (“Plan”) and. Metropolitan. Life Insurance Company (“Met-Life”) appeal. a district court decision granting Plaintiff-Appellee’s motion for judgment on the administrative record. In -2009, Plaintiff-Appellee Steven Stock-man. (“Stockman”) was injured in an. accident and lost the use of his left foot for one year. A series of surgeries partially restored Stockman’s use of the foot, but it remains permanently damaged. Stock-man, a beneficiary under the Plan, .submitted a claim for benefits, but the Plan’s administrator, MetLife, denied the claim, determining that any. loss that Stoclonan experienced was neither “permanent” nor “total” and therefore did not qualify for coverage under the policy. After exhausting his administrative remedies, Stockman sued the Plan and MetLife for coverage under the Employee Retirement Security Act of 1974 (“ERISA”). The district court granted Stockman’s motion for judgment on the administrative record and denied MetLife and the Plan’s cross-motion, concluding that Stockman’s injury fell within the Plan’s promise that “the permanent and total loss of function of the hand or foot as a result of an accident after the loss *245 has continued for at least 12 consecutive months” would be covered. MetLife and the Plan timely appealed. For the following reasons, we AFFIRM.
I.
A,
Near midnight on October 19, 2009, Steven Stockman fell two stories from a ladder while he was attempting to change a light bulb in his home. Stockman “landed on his feet, and experienced immediate pain in his left foot.” Stockman’s wife, Nicky Leonard (“Leonard”),. drove him to the hospital, where he was admitted to the emergency room and .initially diagnosed with a severe ankle sprain. A subsequent x-ray revealed, however, that Stockman had shattered his heel bone.[2]
Stockman began treatment with Michael Barnett (“Dr. Barnett”), an orthopedic surgeon, on November 3, 2009. Dr. Barnett affirmed the hospital radiologist’s conclusion that Stockman suffered from “a left calcaneus fracture, a fracture of the heel bone.” Dr. Barnett also diagnosed Stock-man “with a right knee abscess that was draining purulent material,” which had developed from Stockman’s having to crawl on his knee to get around his home. Treatment of the abscess delayed surgery on Stockman’s heel fracture, and Stock-man developed infections of the bone and surrounding soft tissue, as well as an inflammation of the tissue on the bottom of his foot, after the surgery.[3] ■'
As a result of his injury, Stockman underwent seven surgeries to repair his foot beginning November 12,2009, and continuing through June 25, 2010.[4] Stockman’s foot could not bear weight during this time. On July 1, 2010, nine months after the injury, Dr. Barnett, concluded that Stockman’s foot was “completely non-weight bearing” and that he was unable to use the foot. On July 20, 2010, Dr. Barnett referred Stockman to a plastic sur-' geon, having concluded that his wound was not healing properly. On September 14, 2010, Stockman was “not -putting any weight” on his left foot, and Dr. Barnett gave him a handicap placard- to help him .perform daily life activities. Stockman was still unable to put weight on his foot when Dr. Barnett next saw him the following month.
On November. 9, 2010, Stockman had a follow-up appointment with Dr. Barnett, whose notes from that visit -state:
*246 [Stockman] knows that he will never have a normal foot again and may end up with chronic disability from this injury, but he is very happy that he still has his foot and was thankful to me for saving it for him.,
Dr. Barnett also told Stockman to “get out as much as he can on his foot to try and get weight back on [his foot]” and that if Stockman started to “put[ ] weight on [the foot] the bone should start to feel better.” Dr. Barnett stated that he believed Stock-man was “very scared to-do so” and referred him to a physical therapist who he' believed could help Stockman. In a sworn' statement, Dr. Barnett asserted that he believed that the destruction of Stockman’s left heel bone was “permanent.”
The following year, Dr. Barnett noted that on. May 23, 2011, Stockman walked into his appointment, but that he “still had severe sharp .pain in his heel” and “even had to' put his foot up on the table.” On August 30, 2011, the date of Stockman’s last visit, Dr. Barnett noted that Stockman was able to limp into the office.[5] At the time, Stockman did not have a cane; he was provided one shortly thereafter, and Dr. Barnett expects that Stockman will have to use it for rest of his life.
Dr. Barnett concluded that Stockman’s injury resulted “in a loss of normal function” because Stockman could not use his foot “for propulsion, for locomotion,”,or “to get around.” When questioned about Stockmans injury and the Plan, Dr. Barnett asserted that Stockman’s loss of normal function had been continuous for at least 12 consecutive months and that he believed “Stockman would have met the definition that the MetLife policy lays out.” Though Dr. Barnett stated that Stockman can “still use [his foot],” he clarified that Stockman will likely require “an assistive device of some kind such as a cane and possibly even a scooter if a traumatic arthritis worsens over time.”
B.
1.
At the time of Stockman’s injury, his wife, was a GE employee covered by the company’s dependent accidental death or dismemberment benefit plan. On November 9, 2010, a little over a year after the accident, she submitted a claim for benefits on Stockman’s, behalf. The claim included a statement from Stockman that he had had “no use of his left foot” since the accident. It also included Dr. Barnett’s statement as Stockman’s attending physician explaining that Stockman had suffered “several set backs [sic ] and complications ... including multiple infections” following the injury. Dr. Barnett’s statement also indicated that Stockman had not been able to bear weight on his left foot since November 3,2009.
On May 31, 2011, MetLife sent a letter advising Leonard and Stockman that it .had received the claim. The letter went on to explain that MetLife needed more information “regarding the extent of [Stockman]’s injuiy(ies).” Under the policy,[6] a “[l]oss of hand or foot means the hand or foot is severed at or above the wrist or ankle joint, or means the permanent and total loss of function of the hand or foot as a result of an accident after the loss has continued for at least 12 consecutive months.” MetLife claimed that the *247 documentation that had been provided was not conclusive regarding a “permanent and total loss of function” that had “continued for at least 12 consecutive months.” Met-Life requested additional documentation to meet the requirements.' MetLife claims that it received no additional documentation following its request. Stockman claims that he provided the emergency room visit notes, surgery and procedure reports, and other documentation following MetLife’s request for additional documentation.[7] ;,
In a letter dated August 9, 2011, Met-Life denied Stockman’s claim for benefits. MetLife stated that the claim “must be denied” because they had “not been provided evidence that the ‘loss continued for at least 12 consecutive months’ as is required under the Plan.” MetLife reiterated that a covered “loss” entails “the permanent and total loss of function of the ... foot as a result of an accident after the loss has continued for at least 12 consecutive months.” The letter also explained Stock-man had the right to appeal the decision within 60 days by submitting a written request for appeal to MetLife. In the event that the appeal was denied in whole or in part, Stockman was informed that he had the right to bring a civil action pursuant to Section 502(a) of ERISA.
2.
On October 13, 2011, MetLife received Mr. Stockman’s appeal. The eleven-page appeal included “about 1000 pages of additional medical records” and a sworn statement from Dr. Barnett detailing Stockman’s diagnoses and treatments. Stockman also submitted notes from his in-home nursing care provider documenting that he’ received continuous in-home health care and treatment from June 30, 2010, through November 16, 2010. Also submitted were photographs of Stock-man’s injured foot taken between September 2011' and October 2011, and CT images injury taken in 2011.
In addition to these documents, Stock-man included’ a personal, statement in which he described how the injury affects his daily life. Stockman stated that the “quality' of life as [he] knew it was gone,” that he “spent every minute of every day in constant pain,” and was unable to do “simple things” in life. Specifically, Stock: man noted that he will never run, jump, ride bikes, walk, or go bowling with his children and wife again. Stockman explained that be takes eight Vicodin pills each day for “minimal” pain relief, medicine that he must take two-to-three hours ahead of time if he needs to venture out of his home. Stockman also reiterated that, during the period between the accident on October 20, 2009, and October 20, 2010, he had continuous surgeries, had nó use of his left foot, and used a small four-wheel push scooter to get around to prevent his foot from touching the ground or bearing weight on- his left foot.
Upon receipt of the additional documentation, MetLife directed Dr. Elyssa Del Valle (“Dr. Del Valle”) to complete a medical referral review on Stockman’s claim. In her subsequent report, Dr. Del Valle stated that, “[w]ithin a reasonable degree of medical certainty, it can be determined that the injury sustained on 10/20/09 ... resulted in a permanent loss of normal function of [Stockman’s] foot.” She also noted, however, that Stockman retained “some functionality of the left foot” and *248 that he could ‘^weight bear with limitations and [could] walk with a cane.” Dr. Del Valle concluded that “if total loss of function means total inability to perform activities .attributed to feet such .as stand, walk and for locomotion, then [Stockman did] not have total loss of function as he [was] capable of walking and standing.” She further concluded that, “within a reasonable degree' of certainty,” Stockman “did have total loss of function of the left foot for a period óf more than 12 months.”
Following the report from Dr. Del Valle, MetLife sent Stockman a letter dated November 22, 2011, upholding the denial of his claim. The letter cited Stockman’s ability to walk into his appointments with Dr. Barnett on May 23, 2011, and August 30, 2011, as proof that Stockman “has use and function of his left foot.” Unlike its first denial, MetLife’s second denial seemed to concede that Stockman lost use and function of his left foot for , twelve consecutive months, but alternately concluded, that because he was able to walk without an assistive device at some point following those initial twelve months, the loss was not “permanent and total” as required by the Plan. Because this reason for denial differed from the reason in Met-Life’s first denial of benefits, MetLife allowed Mr. Stockman a second opportunity to appeal. As with the first appeal, Stock-man would have to provide additional documentation within 60 days of receipt of the letter, and if the appeal was denied in whole or in 'part, he would have the right to file a civil action pursuant to Section 502(a) of ERISA.
3.
In a letter dated December 19, 2011,[8] Stockman’s attorney notified MetLife'that it was Stockman’s position that he had exhausted all of his administratiye remedies., , Stockman requested that, MetLife treat the letter as his formal appeal and asked that MetLife take any steps necessary to exhaust his administrative remedies, Stockman did not provide any additional documentation with the December 19, 2011, letter as he did “not have any additional documentation to submit.” The letter also stated that if MetLife’s position did not change, Stockman would “promptly file suit directly after, receiving, that response.”
In an appeal review form dated January 6, 2012, MetLife noted that it had reexamined Stockman’s claim and stated that his most recent letter did not “provide any additional points of appeal” or “include any additional documentation to support an appeal.” Relying on the information in the previously submitted-appeal, MetLife concluded that “though [Stockman’s injury] did continue for 12- consecutive months, [the injury] was neither permanent [n]or total, which [was] required by the plan.” MetLife upheld its previous denial of claim benefits and notified Stockman that he had the right-to file a civil action.
C.
Stockman filed his complaint in federal district court on February '22, 2012. Both parties moved for judgment on the administrative record on October 19, 2012, On November 30, 2012, they both also filed responses to the motions. Stockman argued that MetLife’s decision to deny his claim was flawed for’two reasons: (1) Met-Life failed to interpret the phrase “total loss of function” in the “ordinary and popular sense” as required by law; and (2) MetLife failed to look at the full administrative record, instead only taking into account “a few select statements of a treating physician ... and crafted a denial *249 around them.” Stockman insisted that, the administrative record before the district court — and before MetLife at the time of its denial — “demonstrates that when -the terms of the Plan are applied in their ‘plain and ordinary sense,[5] the injury to Mr. Stockman’s foot .constitutes a ‘total loss -of function! and he is entitled to a judgment on the record .and an .award of AD & D benefits - in the .amount of $125,000.00, plus interest from the date of loss and costs of this action.”
Conversely, MetLife argued -that its denial of- Stockman’s claim for dismemberment benefits was proper. MetLife relied heavily on statements made by Dr. Barnett in which he noted that “Plaintiff was able to walk on his foot and- could even do so for lengthy periods.” MetLife argued that because .the Plan pays, dismemberment benefits “only where a foot has been severed at or above the ankle, or where there has been a ‘permanent and total loss of function’ ” and because Stockman’s foot was not severed, the administrative record, including Dr. Barnett’s statement, demonstrated that Stockman’s injury did not result in a “permanent and total loss of use of his foot.”
On September 27, 2013, the -district court issued an opinion granting Stockman summary judgment on'the administrative record and overruling the defendants’ motion for the same. The district court first noted that that it was undisputed that Stockman could only receive claim benefits under the second clause of the Plan’s definition of “loss” — ie., that it had been clear from the outset that Stockman’s foot had not been “severed at or above the ... ankle joint,” but that the clause at issue was “the permanent and total loss,of function of the hand or foot as a result of an accident after the loss has continued for at least 12 consecutive months”. In.particular, the court noted that as of the date of Stockman’s initial claim .under the policy, he clearly fit within the Plan’s definition of “loss”:
The court’s review of the administrative record shows that on November 9, 2010, over twelve •-consecutive months had passed, during which period of time Stockman could not place any weight on his foot-without excruciating pain that required heavy doses of pain medication. That finding accords with the policy definition of a permanent and total loss of function of Stockman’s foot, after the loss had continued for at least 12 consecutive months.
While the court acknowledged Dr. Barnett’s statements that Stockman had been able to ambulate, it emphasized that Dr. Barnett’s statements needed to be taken in context, and that, MetLife’s reliance on “minimal improvements in weight bearing and ambulation that. [Stockman] was able to achieve 19 to 22 months after the accident” and the “mere fact that [Mr.] Stock-man’s foot was still attached to his body” were not sufficient to “demonstrate functionality.” The district court also highlighted that MetLife’s own physician reviewer, Dr. Del Valle, had concluded that Stockman’s “total loss of function following the accident was for more than 12 consecutive months,” supporting an award of benefits under the definition in the Plan.
The district court was particularly concerned that MetLife changed its reason for denial between Stockman’s initial claim and his appeal some months later. As discussed, on November 9, 2010, the date of Stockman’s application for benefits, over twelve consecutive months had passed in which he could, not bear weight on his foot. MetLife denied that claim on August 9, 2011, on the grounds that, “according to the information provided to MetLife, [it had] not been provided with evidence that the ‘loss has continued for at least 12 *250 consecutive months’ as is required under the Plan.” Stockman appealed, and' after MetLife’s own physician reviewer concluded that he had indeed had a “total logs of function following the accident [■] for more than 12 consecutive months,” MetLife denied his appeal on the grounds that “the loss is not ‘permanent and total/ as is required by the term of the Plan[.]”-
The district court took issue with Met-Life’s shifting grounds for denial, stating that
Defendants cannot use the word “permanent” in the definition of loss to evade the definition’s criterion that, once the “permanent and total loss of function” has lasted for twelve' "consecutive months, the beneficiary is entitled to benefits. Such a reading would allow Defendants to point to any minimalim--provement, after twelve ' consecutive months and eligibility has been éstáb-lished, as a basis for denying eligibility. Furthermore, to the extent that “permanent” and “continued for at least 12 consecutive months,” as conditions of loss, create an ambiguity, the Court must construe the language in Stock-man’s favor.
Ultimately, the district court concluded that Stockman “suffered a ‘permanent and total loss of function’ of his foot, and that the loss continued for at least twelve months after the date of his injury.” Accordingly, the district court found for Stockman. MetLife timely appealed.
II.
A.
The underlying purpose of ERISA is to protect “the interests of participants in employee benefit plans and their beneficiaries.” 29 U.S.C. § 1001(b); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (citing Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). Both the district court and this Court review de novo a plan . administrator’s denial of ERISA benefits, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. See Firestone, 489 U.S. at 115, 109 S.Ct. 948. This de novo standard of review applies to the plari administrator’s factual determinations as well as his .-legal conclusions. See Rowan v. Unum Life Ins. Co., 119 F.3d 433, 435 (6th Cir.1997).
The language in an insurance policy “is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different - or special meaning was intended.” Comerica Bank v. Lexington, Ins. Co., 3 F.3d 939, 942 (6th Cir.1993). “[T]he terms of an ERISA plan [are to]'be interpreted-in-an ordinary and popular sense, and [] any ambiguities in the language of the plan [are to] be construed ■ strictly against the drafter of the plan.” Regents of Univ. of Mich. v. Empls. of Agency Rent—A—Car Hosp., Ass’n, 122 F.3d 336, 339-40 (6th Cir.1997). “A technical construction of a policy’s language which would defeat a reasonable expectation of coverage is not favored ... [and] an insurer has a duty, to express clearly the limitations in its policy.” Id. at 339.
When interpreting ERISA plan provisions, courts have at times gone beyond the actual’language of the plan to ascertain the underlying intent. See-Citizens Ins. Co. of Am. v. MidMichigan Health ConnectCare Network Plan, 449 F.3d 688, 692-93 (6th Cir.2006). However, we have the “paramount responsibility in construing plan language ...- to ascertain and effectuate the underlying intent.” Id. (citations omitted). Therefore, we must first *251 reference the plan language itself, but may also consider reasonable inferences and presumptions under the particular circumstances of the claim. The language of a plan is ambiguous only “if it is subject to two reasonable interpretations.” Id. at 694; see also Schachner v. Blue Cross & Blue Shield of Ohio, 77 F.3d 889, 893 (6th Cir.1996). In other words, if Plan language, “however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear.” Reardon v. Kelly Servs., Inc., 210 Fed.Appx. 456, 459 (6th Cir.2006).
B.
In the case at bar, the specific language of the Plan defines loss of a foot as a foot that has been “severed at or above the ... ankle joint, or means the permanent and total loss of function of the ... foot as a result of an accident after the loss has continued for at least 12 consecutive months.” At issue, essentially, is the following question: Does a “total loss” become “permanent” for purposes of triggering the Plan’s coverage upon lasting for twelve consecutive months after an injury, or must an injury be both total and permanent to trigger coverage under the Plan, for which a twelve-month waiting period is simply a condition of eligibility? MetLife and the Plan say the answer is the latter; Stockman (and the district court), the former.
It is undisputed that Stockman’s foot was not severed and that he seeks benefits pursuant to the portion of the plan that allows for recovery based on the “permanent and total loss of function ... for at least 12 consecutive mouths.” Reviewing the language of the Plan and the administrative record, we conclude that this relevant provision of the Plan is ambiguous or, in other words, subject to two reasonable interpretations. ■
• Beginning with the second requirement, we find that Stockman did lose the use of his foot for twelve consecutive months. Following Stockman’s initial claim for benefits on November 9, 2010, MetLife denied his claim because he had not submitted sufficient documentation to determine that he had suffered a “ ‘loss [that had] continued for at least 12 consecutive months’ as is required under the Plan.” Assuming, without deciding, that this was in fact the case at the time of Stockman’s initial application, We are satisfied that this was not the case following the submission of considerable additional documentation to the administrative record during Stockman’s first appeal (and MetLife’s second denial). A review of the complete record reveals that between the date of the accident, October 20, 2009, and October 20, 2010, Stockman underwent numerous surgeries and had no use of his left foot, suffered from “multiple infections” following the injury, and received continuous in-home health care from June 30, 2010, through November 16, 2010. Both Stockman and Dr. Barnett stated that Stockman used a push scooter to get around to prevent his left foot from touching the ground or bearing weight. We find that, based on these facts, Stockman had a “total loss of function [of his left foot] ... for at least 12 consecutive months.” MetLife and the Plan do. not'dispute this interpretation on appeal.
The' aspect of the Plan’s language we question, however, is the first require-, ment — ie., that’Stockman suffer a “permanent and total” loss of function to qualify for benefits. In particular, “permanent” is the term that renders the Plan language unclear in light of the other requirements *252 of the provision.[9], As discussed, the parties offer different interpretations of this term in context. MetLife and the Plan concede that'' “Stockman submitted evidence that arguably shows' a total loss of function for twelve months.” They insist, however,- that “none of the medical evidence ... supports a finding that any total loss of function is permanent,” and that “[t]here is no ambiguity -in the Plant’s] equirements.]” Stockman counters that the district court’s interpretation was correct: that the Plan language is susceptible to two reasonable interpretations, and asserts that the resulting ambiguity must be construed against MetLife and the Plan under the doctrine of contra proferentem. See Marquette Gen. Hosp. v. Goodman Forest Indus., 315 F.3d 629, 632 & n. 1 (6th Cir.2003); Regents of Univ. of Mick, 122 F.3d at 339-40 (“[A]ny ambiguities in the language of the plan [are to] be construed strictly against the drafter of the plan.”).
We find that the meaning of the term “permanent” is ambiguous in light of the other provisions of the policy. Simply put, a reading of the policy alone does not clarify which interpretation of the term is córrect, and either interpretation is feasible under its terms. Federal law holds that we may use “traditional methods of contract interpretation to resolve th[at] ambiguity, including' drawing inferences and presumptions and introducing extrinsic evidence.” Boyer v. Douglas Components Corp., 986 F.2d 999, 1005 (6th Cir.1993). We therefore begin with the “ordinary meaning” of the word “permanent.” Comerica Bank, 3 F.3d at 942. Stockman argues that the dictionary definition of the word should apply. We agree. Webster’s Dictionary defines “permanent” as something that is “continuing or enduring without fundamental or marked change: STABLE.” Merriam-Wébster Online Dictionary (http://www.merriam-webster. com/dictionary/permanent, last ■ visited May 21, .2015).
MetLife counters that Stockman’s injury was not “permanent” because he was able to walk without an assistive device at some point following the initial twelve-month period. However, we are unpersuaded that this alone means that Stockman’s loss of use ‘of his foot was not “continuing or enduring without fundamental or marked change.” In his sworn statement, Dr. Barnett highlighted that Stockman’s injury is not expected to improve:
At this point [Stockman] is reaching what we call maximum medical improvement. I don’t expect [Stockman]’s condition to get much better over the next few months or the next five years or even ten years. [Stockman] is far enough out from his surgeries that we can begin to predict what his level of functioning is going to be for the rest of his life....
I do expect [Stockman] for the rest of his life will require, at times, the brief use of a cane for brief periods, maybe he will not use anything at all but I do not anticipate him doing this for long periods of time.”
Dr. Barnett also stated that “the destruction of [Stockman’s] calcaneus [heel] is permanent” because, “from an orthopedic standpoint,” Stockman “has loss of the bony tissue which can never recover or be rebuilt in any way.” Stockman’s condition is considered “chronic,” which "Dr. Barnett explained means “it is expected'to be with the patient permanently.” Finally, Dr. Barnett also acknowledged that the arthritis Stockman suffers as a result of the *253 accident “may, in fact, be progressive — Arthritis will tend to get worse over time; therefore, I am expecting [Stockman] to have future problems with the subtalar arthritis that he experienced after the trauma____ He’ll likely need an assistive device ... if traumatic arthritis worsens over time.” To the extent Stockman’s condition is not “stable,” it will only get worse.
Additionally, we note that there is no indication that using this definition causes the reading of the whole instrument to. have a different or special meaning than what was intended. See Comerioa, 8 F.3d at 942. There is in fact more than one plausible reading of the provision. Addressing MetLife’s proffered example, where a Plan participant suffers a broken hand in January 2012, the hand is still in a rigid cast and totally immobile in January 2013, the claimant files for benefits on February 1, 2013, and the cast'comes off and the claimant regains full use of his hand by March 1, 2013, we find the instant case is distinguishable. Unlike the Plan participant, in MetLife’s example, it is undisputed that Stockman has not regained full use of his foot. Quite the opposite: both Dr. Barnett and Dr. Del Valle have, based on their extensive medical knowledge, determined that Stockman will never regain normal use of his foot again. If Stockman’s injury, which has resulted in the “permanent” loss of the use of his foot in the way that a foot should be used does not qualify him to receive benefits, we are unsure of a situation, absent actual severance, where a claimant would qualify.
It is not our intention to convert the dismemberment Plan into a disability plan, to fundamentally and improperly alter the Plan, or to read the term “permanent” in a way that would render it superfluous. However, based on the facts in this particular case, we conclude that the word “permanent,” if interpreted in the way urged by. the Plan, and MetLife, will create an insurmountable requirement to claim benefits. As emphasized by the district court, to hold otherwise “would allow Defendants to point to any minimal improvement, after twelve consecutive months and eligibility has been established, as a basis for denying eligibility.” Though we acknowledge MetLife’s argument that, “dismemberment is permanent and total,” the Plan explicitly allows for the recovery of benefits when a person, has suffered an injury that, for all intents arid purposes, has resulted in the loss of the use of the foot to the point where it no longer serves the purpose it was intended to serve and will never be able to serve that purpose again.
It is undisputed that Stockman had a total loss of the function of his foot for at least twelve months, consecutively. “[T]he terms of an ERISA plan [are to] be interpreted in an ordinary and popular sense, and [ ] any ambiguities in the language of the plan [are to] be construed strictly against the drafter of the plan.” Regents of Univ. of Mich., 122 F.3d at 340. Construing the language of the dismemberment provision in MetLife’s plan according to the ordinary sense of its language and resolving ambiguities against the drafter, we find it inescapable that MetLife’s reading of the provision is incorrect in this case, and that Stockman is qualified to receive benefits because he has suffered a “permanent and total loss of function of [his] ... foot as a result of an accident after the loss ... continued for at least 12 consecutive months.”
in.
Accordingly, we AFFIRM the judgment of the district court and REMAND the case for a determination of attorney fees.

. Judge Boggs has filed a separate dissent.

. "Stockman had a comminuted calcaneal fracture with soft tissue swelling.”

. Throughout his treatment with Dr. Barnett, Stockman was diagnosed with calcaneal os-teomyelitis (bone infection), left plantar fasci-itis (inflammation of the tissue at the bottom of the foot), traumatic arthropathy of the left subtalar joint (arthritis in the joint between the calcaneus and talus), and cellulitis (soft tissue infection) of the left foot.

. Specifically, Stockman's surgeries were: (1) a November 12, 2009, open reduction internal fixation of the calcaneus fracture (placing the fractured fragments of the bone back in anatomic position and putting plates and screws inside of the foot to try and hold the bone together until the bone is able to heal and bear weight); (2) a January 19, 2010, irrigation and debridement to take way nonviable tissue due to infection; (3) a second irrigation and debridement; (4) a- third de-bridement performed on January 26, 2010— as a result of the third debridement, Doctor Barnett placed a cement spacer containing antibiotics inside of Stockman’s foot "to try to elute antibiotics over the course of the next eight weeks while [Stockman was] being treated by the infectious disease service with the IV antibiotics”; (5) a June 25, 2010, repeat irrigation and debridement where Dr. Barnett removed the cement spacer; (6) a repeat debridement and irrigation; and (7) a wound vacuum system procedure performed by plastic surgeon, Dr. Michael Johnson.

. In a sworn statement, Dr. Barnett observed that Stockman "had gained some mild use of his foot to the point where he'was able to walk with an antalgic gait into [Dr. Barnett's] office without any assistive devices.”

. MetLife’s letter quotes Section 1.3.1 of the GE Benefits Handbook for Exempt and Nonexempt Employees Eligible to Participate in GE Life Insurance and Disability Benefits.

, At some point following the filing of Stock-man’s claim, MetLife received the treatment notes from Stockman's emergency room visit, reports for surgeries and procedures that were performed following his fracture and subsequent infection, and a physical therapy evaluation.

. The record indicates that MetLife received the letter on January 3, 2012.

.' Thé Court need not address the definitions of "total,” "loss,” and “function” as MetLife has not denied Stockman’s claim for failure to satisfy those requirements.

. The majority expresses concern that a plain-language interpretation of the Plan would "create an insurmountable requirement to claim benefits,” Maj. Op. at 253, and posits that it is "unsure of a situation, absent actual severance, where a claimant would qualify” under MetLife’s reading. Id. at 253. These concerns are overstated. Tndeed, all parties, including MetLife’s own expert, agree that Stockman himself suffered from a total loss of function for the twelve months following the accident, without actual severance. All that is preventing Stockman from meeting the Plan’s requirements for coverage is the lack of expressed medical judgment that such total loss would continue "without fundamental or marked change” in the future. It is certainly possible to envision circumstances where a beneficiary with a similar injury (and a slightly worse prognosis) would be able to make this showing without suffering a severance.